No. 72,493

STATE OF KANSAS, *Appellee*, v. KENNETH M. COOK, *Appellant*.

(913 P.2d 97)

Opinion filed March 8, 1996.

*Steven C. Moss*, assistant appellate defender, argued the cause, and *Rebecca E. Woodman*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with him on the briefs for appellant.

*Joan M. Hamilton*, district attorney, argued the cause, and *Anthony W. Mattivi*, assistant district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Kenneth M. Cook, from his conviction for first-degree murder (K.S.A. 1992 Supp. 21-3401[a]) and from his "hard 40" sentence.

Cook raises five issues. Three issues deal with jury instructions and jury orientation commentary; one issue deals with whether a State witness was unavailable so that the witness' testimony from the preliminary hearing could be used at the defendant's trial; and the last issue deals with the sufficiency of evidence to warrant the imposition of the hard 40 sentence.

This case revolves around the discovery of a body on September 13, 1992, in the Wakarusa River. The body was eventually identified as Charles Duty, a/k/a Donnie Ray Perkins. The facts will be set forth as necessary in discussing the issues.

## I. Availability of Witness

The witness in question, David Rudell, was a key witness for the State. He was the only witness who planned to testify that the defendant committed the murder. The State did have another witness who testified that the defendant told him that he (the defendant) had committed the murder.

After the murder, Rudell left the state, ostensibly for his safety. The State had some difficulty in locating Rudell, and he was returned to Kansas for an inquisition under the material witness statute (K.S.A. 22-4203). On June 3, 1993, Rudell testified at the inquisition conducted by the district attorney. As a result of this inquisition, the defendant was charged with the first-degree murder of Charles Duty. After testifying at the inquisition, Rudell promised to cooperate and return for the preliminary hearing. Rudell appeared and testified for the State at the defendant's preliminary hearing on October 13-14, 1993. Rudell was subjected to cross-examination by counsel for the defendant and by counsel for codefendant Beth Hebert. At this time, Rudell testified that he lived in California.

Hebert pleaded guilty to a lesser offense, and her trial was canceled. However, Rudell had already left California and begun traveling to Kansas in order to appear at Hebert's trial when he was informed that the trial had been canceled. Rudell requested that his travel expenses for this trip be paid. The court refused to authorize witness fees. Eventually, the district attorney's office authorized the payment of Rudell's travel expenses out of its own budget once Rudell proved that he had actually begun traveling to Kansas for Hebert's trial by producing telephone records. According to Rudell's attorney, Rudell was upset with the State due to the difficulty he had in getting his expenses reimbursed. However, the State interpreted Rudell's attempt to appear at Hebert's trial as an indication of Rudell's willingness to cooperate with the State

at all times. In fact, the State contends that on each and every occasion prior to the defendant's trial, Rudell had made himself available as needed. The State kept in contact with Rudell through his attorney, Wendell Betts. Betts kept in contact with Rudell by phone on a regular basis and kept Rudell apprised of his obligations regarding the defendant's trial. However, Betts never had a telephone number or address where Rudell could be located. Rather, Rudell always called Betts at a specific time from different locations, and Betts would convey any messages from the State to Rudell.

On Tuesday, February 22, 1994, a week before the defendant's scheduled trial, Rudell called the district attorney and indicated that he could not come to Kansas for the defendant's trial unless his travel expenses were paid up front. The district attorney told Rudell that it would be difficult to get the money authorized up front because Rudell only had a right to travel expenses after he had testified. The district attorney also told Rudell that she did not have the money in her budget to pay Rudell's travel expenses as she had done when he tried to attend Hebert's trial and that all she could do was to request the money from the court. The next day, Rudell informed his attorney, Betts, that he was financially unable to be present at the trial. As a result of this conversation, Rudell's attorney gave the district attorney a letter on Wednesday, February 23, 1994, which indicated that if Rudell did not receive at least part of his travel money up front, then he would not be present at the defendant's trial.

On Wednesday, February 23, 1994, the district attorney's secretary informally contacted the administrative law judge to see if funds could be made available up front for Rudell. The judge denied the funds, and the district attorney requested a formal hearing on the matter to be held the following afternoon. The initial denial of funds was communicated to Rudell by the district attorney on Wednesday. However, the district attorney instructed Rudell to call her back on Friday and again before he left for the weekend because the money might become available. Betts also spoke to Rudell on Wednesday at 4:30 p.m. and reiterated that funds were not available.

The following day at the hearing, the district attorney requested an order to disburse funds to Rudell. At this hearing, the court asked the district attorney whether "as the prosecutor and officer of the court that [Rudell] is in your best judgment absolutely a material witness still to this case." The district attorney answered affirmatively.

At the conclusion of the hearing, the court determined that Rudell had never been released from his material witness bond and was therefore still under the jurisdiction of the court. The court also determined that Rudell had been summoned pursuant to the material witness statute, K.S.A. 22-4203, and, as a result, had a binding obligation to appear in court for the trial of the defendant. The judge released the funds late on Thursday, February 24, 1994.

At this time, the district attorney asked if she could give the check to Betts "so he can do whatever he has to to get it to the witness." Betts told the district attorney to send the money via Western Union because Rudell could not always be located at a specific number or address. The district attorney sent the money to Rudell via Western Union. However, Rudell never picked up the money nor called his attorney or the district attorney to ask about the money. Betts attempted to reach Rudell at the numbers from which Rudell had previously called without success. Rudell has not been in contact with Betts or the district attorney's office since Wednesday, February 23, 1994.

The defendant's trial commenced on February 28, 1994, and Rudell was not present. The district attorney asked the district court to find Rudell unavailable as a witness and admit his preliminary hearing testimony.

The defense counsel argued that the State had not demonstrated unavailability. According to the defendant, the district attorney knew that Rudell needed funds to attend the trial but did not plan ahead to insure that these funds would be available to Rudell, as she should have done. Further, the defendant argued that the State should have compelled Rudell to provide an address. The defendant also pointed out that it would not have an opportunity to cross-examine Rudell at trial if he was declared an unavailable witness and his preliminary testimony was admitted. While the defendant

did cross-examine Rudell at the preliminary hearing, the defendant contended that this cross-examination was inadequate due to information which had come to light since the preliminary hearing.

The defendant claims he did not have an opportunity to cross-examine Rudell about this new information at the preliminary hearing. For instance, when Rudell testified at the inquisition, a man named Gerald Delay had been charged with Duty's murder. After Rudell's inquisition testimony, the charge against Delay was dismissed and the defendant was charged with the crime. After the inquisition but before the preliminary hearing, Rudell began an affair with Delay's attorney. Apparently the defendant was worried that Rudell could have gleaned important details about the crime from Delay's attorney which would make Rudell's testimony (which the defendant alleges to be false) accusing the defendant sound more credible. Thus, the defendant felt that this would be important information to bring out during the cross-examination of Rudell. The defendant points out that he would not be able to bring out this information regarding the affair if Rudell was declared an unavailable witness and his preliminary hearing testimony was read into evidence.

After hearing these arguments, the court found Rudell unavailable. Since Rudell was found to be an unavailable witness, Rudell's preliminary hearing transcript was read into the record at the defendant's trial. The determination by the district court that a witness is unavailable to testify will not be disturbed on appeal unless an abuse of discretion is shown. *State v. Vaughn*, 254 Kan. 191, 201, 865 P.2d 207 (1993); *State v. Steward*, 219 Kan. 256, Syl. ¶ 6, 547 P.2d 773 (1976).

K.S.A. 60-460(c)(2)(B) authorizes the hearsay use of preliminary hearing testimony in a trial of the same action if the declarant is unavailable at the trial and the adverse party had the right and opportunity for valid cross-examination at the preliminary hearing. However, K.S.A. 60-460(c)(2) does not apply in criminal actions if it denies the defendant the right to confront the witness. Here, the district court found that Rudell was unavailable and that the defendant had an opportunity to cross-examine Rudell when he testified at the preliminary hearing.

K.S.A. 60-459(g) defines unavailable witness in pertinent part as "absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts." Thus, before a witness may be declared unavailable and before the State may use the prior testimony of the absent witness, the State must show that the witness cannot be produced at trial by the exercise of due diligence and good faith. *State v. Alderdice*, 221 Kan. 684, 686-87, 561 P.2d 845 (1977).

We have not attempted to define the term due diligence with any preciseness. Rather, each case turns on its own particular facts and circumstances. *Alderdice*, 221 Kan. at 687 (quoting *Steward*, 219 Kan. at 264). According to the defendant, the district court should not have declared Rudell an unavailable witness because the State did not demonstrate due diligence in securing Rudell's presence at trial. Thus, the defendant contends the trial court violated his constitutional rights to confront the witnesses against him and committed reversible error by allowing Rudell's prior testimony to be admitted at the trial.

In making this argument, the defendant points to *State v. Mitchell*, 18 Kan. App. 2d 530, Syl. ¶ 3, 855 P.2d 989 (1993), in which the court held that more than the simple issuance of compulsory process must be shown to satisfy the State's burden of due diligence for a finding of unavailability. In comparison, the defendant contends that here the State did not even issue a compulsory process on Rudell or Rudell's attorney to compel Rudell's presence at trial, much less go beyond this to satisfy its burden of due diligence. Further, the defendant asserts that the State did not attempt to secure Rudell's presence pursuant to the material witness statute, K.S.A. 22-4203. Rather, the State simply relied upon a gentleman's agreement that Rudell would appear because the district court asked him to do so.

The State rebuts this argument by pointing out that Kansas law does not require a witness to have been served a subpoena in order to be declared unavailable if the State does not know the whereabouts of the witness and the witness appears cooperative. The State does not argue that the defendant was subject to the material

witness bond or any other type of process. Rather, the State contends that even without the issuance of a subpoena, it exercised due diligence under the circumstances based on the witness' cooperative attitude.

In *State v. Bey*, 217 Kan. 251, 535 P.2d 881 (1975), the defendant appealed his conviction of first-degree murder. The defendant contended that a State witness was improperly found to be unavailable. Thus, the State was improperly allowed to read the witness' preliminary hearing testimony at the trial pursuant to K.S.A. 60-460(c)(2). According to the defendant, the witness was improperly found to be unavailable because the State did not prove that it used due diligence to secure the appearance of the witness at trial, especially since the witness was not even served with a subpoena compelling his appearance at trial.

In *Bey*, the State presented the following evidence to demonstrate its due diligence in attempting to locate the witness: The district attorney verified with the witness that he would be available to testify at trial. The witness cooperated by providing the State with his address in Marshall, Missouri, and his phone number. The State issued a subpoena to be served on the witness one week before trial at the address which the witness provided. The subpoena was not served. Upon becoming aware that the subpoena was not served, the State tried to telephone the witness at the number which he had provided, but the line had been disconnected. At this point, the State contacted the Marshall police department and asked it to locate the witness. The police informed the State that the witness had moved to Fair Play, Missouri, in Polk County. The State obtained a phone number for the witness in Fair Play by using directory assistance but the phone was never answered. In fact, a deputy from the Polk County Sheriff's office called and drove by the witness' house several times but did not locate him. The deputy even left a note at the witness' house which was apparently picked up but never responded to. Finally, the State enlisted the help of the witness' friends, brother, and nephew to try to locate the witness, with no success. However, once the State realized that the defendant had moved to Polk County, it never

issued a subpoena to the Polk County Sheriff to serve on the witness.

This court upheld the trial court's finding that the witness was unavailable. The court found that it would have been useless for the State to issue a subpoena in Polk County when the Sheriff could not even contact the witness, let alone serve him. This court acknowledged that the State could have allowed itself more time to serve the witness. However, the court did not find that the State's failure to plan ahead indicated a lack of due diligence. As the court pointed out, the State had no reason to anticipate difficulty in serving the witness because the witness had always given the impression that he was a willing and cooperative witness. 217 Kan. at 255.

The State contends this case is analogous to *Bey*. It asserts that the district attorney made a good faith effort to insure Rudell's presence at the trial under the circumstances. The State had no reason to believe that Rudell would not make himself available for the trial because he had been cooperative in the past. For instance, Rudell had attended the preliminary hearing and had attempted to return for Hebert's trial. Further, Rudell indicated he would return for the defendant's trial.

On the other hand, the defendant contends that the State made no effort to insure Rudell's attendance at trial. The defendant contends that even though the State knew Rudell was residing in California, it did not pressure Rudell or his attorney to provide an address or telephone number. Rather, the State simply accepted without question that Rudell did not have an address even though it had previously sent him money for his expenses through Federal Express. Further, the defendant contends that the State demonstrated its lack of good faith by not following through on the trial court's suggestion that an arrest warrant be issued for Rudell's arrest. According to the defendant, the State simply relied on a gentleman's agreement that Rudell would show up for trial.

The defendant contends that a gentleman's agreement might have been appropriate if the State was merely concerned with compelling a minor prosecution witness to appear at the trial. However, the defendant asserts that since the presence of a key material witness was at stake, the State should have taken more binding

measures to insure Rudell's presence at trial. In fact, the defendant points out that the State used legally binding measures, such as a subpoena, to compel the attendance of other, less important, witnesses at the trial, but did not use such due diligence in the case of Rudell. The defendant contends that the State could have found out where Rudell was located and could have served a subpoena on Rudell if it had desired to do so. The defendant questions why the State did not use the same measures it used to locate Rudell for the inquisition in order to locate Rudell for the trial.

The defendant also attempts to rebut the State's argument that the State had no reason to believe a subpoena was necessary because Rudell had always been cooperative in the past. The defendant contends that Rudell did not indicate he would be cooperative. For instance, unlike the witness in *Bey*, Rudell refused to give the State his address. Further, according to the defendant, the State knew that Rudell was upset with the State after he had a difficult time receiving reimbursement for his expenses to attend the Hebert trial. The defendant also asserts that 3 weeks before trial, the State was aware of Rudell's refusal to attend the defendant's trial without money up front but that the State did not attempt to secure this money until it was too late. Moreover, Rudell had previously fled and the State was forced to discover his location and return him to Kansas for the inquisition under a material witness bond. The defendant contends that these are not signs of cooperation so as to indicate that a subpoena is not necessary.

Finally, the defendant contends that even if the State properly proved the unavailability of the witness, the State was still required to demonstrate a sufficient indicia of reliability of the witness' prior testimony in order for the testimony to be admissible as an exception to the constitutional requirement of witness confrontation. *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). The defendant questions the reliability of Rudell's prior testimony based on the fact that Rudell began an affair with Gerald DeLay's attorney after Rudell testified at the inquisition but before he testified at the preliminary hearing. DeLay was originally accused of this murder until Rudell testified at the inquisition and accused the defendant. The defendant points out that he did not

become aware of this information regarding the affair until after the preliminary hearing. Thus, he did not have the opportunity to cross-examine the witness regarding this credibility issue at the preliminary hearing.

In support of his argument that admitting Rudell's preliminary hearing testimony into trial violated his Sixth Amendment right to confront witnesses, the defendant cites to *State v. Kirk*, 211 Kan. 165, 505 P.2d 619 (1973). In *Kirk*, the State witness testified against the defendant in a trial which resulted in a mistrial. After the witness had testified but before the conclusion of the trial, the State had made arrangements and provided funds for the witness and his family to leave the State to protect the witness from harm which might occur due to his testimony. The State did not require a bond to insure the witness' presence at a second trial should one be necessary. The defendant was retried, and the State sought to read the testimony of the witness from the first trial at the second trial because it could not locate the witness.

The State attempted to prove the witness was unavailable by explaining the unsuccessful efforts it took to locate the witness. For instance, the police tried to find the witness at his former Kansas address and the police asked several confidential informants if they knew where the witness could be located. Further, the State issued a subpoena to compel the witness to attend the trial 3 days before the second trial commenced. The State also requested information as to the witness' last known address from the witness' counsel, but the counsel refused to divulge such information based on the attorney-client privilege. The State did not demand that the attorney turn over this information, as it had a right to do. Based on these efforts, this court found that the State did not use due diligence in attempting to secure the witness' presence at trial. In a 4-3 decision, this court held that the witness was not unavailable and that the witness' prior testimony was improperly introduced, thereby violating the Confrontation Clause. 211 Kan. at 171.

The *Kirk* case is distinguishable from this case. The State here did not assist the witness in leaving the State and then try to take advantage of the witness' absence at a later date by introducing his prior testimony without the opportunity for cross-examination.

Further, Rudell's attorney, Betts, did not know Rudell's address and could not have provided it to the State even if the district attorney had demanded it. The fact that Betts did not have an address for Rudell appears to be an effect of Rudell's nomadic lifestyle. Betts did have phone numbers of the locations from which Rudell had called him. Betts called these numbers in an attempt to locate Rudell, without success.

It is true that the State did not serve a subpoena on Rudell. However, unlike the *Kirk* case, the State had no reason to believe that a subpoena was necessary. In this case, the State had no reason to suspect that the witness did not desire to testify at the trial and that a subpoena would be necessary to compel his appearance. In fact, the opposite is true. The witness willingly appeared at the preliminary hearing and was on his way to Kansas to appear at the codefendant's trial, even without his expenses being paid up front, when he learned the trial had pleaded out. Moreover, each time the State had contact with the witness, he always indicated that he would appear when needed and that the State could contact him through his attorney.

In *State v. Mims*, 222 Kan. 335, 564 P.2d 531 (1977), it was the defendant who desired to read the jury the prior testimony of a witness who was not present at trial. The trial judge did not allow the prior testimony to be introduced as evidence because it found that the witness was not unavailable. According to the court, the witness could not be declared unavailable because the defendant had not used diligence in attempting to secure the witness' presence at trial. In attempting to locate the witness, the defendant had left messages for the witness prior to the trial stating that he wished to have the witness testify at trial. Because the defendant was under the impression that the witness would appear, the defendant never had a subpoena served upon the witness. This court affirmed the trial court's finding that the defendant had not exercised due diligence in attempting to locate the witness and that the witness was not unavailable. 222 Kan. at 338.

*Mims* is similar to the case at hand in that the State never served a subpoena on Rudell because the State was under the impression Rudell would appear. However, this case is distinguishable from

*Mims* in that once the State became aware that Rudell might not attend the trial, the State made efforts to fulfill the condition which Rudell stated was necessary for him to attend the trial—money for travel expenses up front. Eventually the State obtained the money and sent it via Western Union to Rudell, but the State was not able to contact him. In *Mims*, it does not appear that the defendant made any effort to locate or compel the witness to attend the trial once he realized that the witness might not appear.

Another case which is analogous to the situation at hand is *State v. Vaughn*, 254 Kan. 191. *Vaughn* supports the State's position that Rudell was an unavailable witness. In *Vaughn*, the defendant wished to read to the jury the prior testimony of a witness because the witness did not appear at the trial. The trial court refused, finding the witness was not unavailable. This court reversed, holding that the defendant had exercised due diligence in attempting to compel the witness' attendance at trial, with no success, and thus declared the witness unavailable. In attempting to compel the witness to attend trial, the defense counsel had talked to the witness several times on the phone, but the witness was evasive and refused to provide a current address or phone number. The counsel typically contacted the witness by leaving a message with his mother, and the witness would then call the defense counsel collect. The witness had promised the defense counsel that he would testify at the trial at issue and at an earlier trial which resulted in a mistrial. The witness had fully cooperated at the earlier trial. Via a collect phone call on the Friday before trial, the witness promised to meet the defense counsel at her office on the Sunday before trial. The counsel planned to serve him with a subpoena at this time. The witness did not show up at the Sunday meeting. When the witness did not show up for the appointment, the counsel called his parole officer. She learned that the witness had not been reporting to his parole officer and that the officer had no current address or telephone number for the witness. The defense counsel also contacted the witness' mother, who reported that she had not been able to locate the witness. Finally, the defense counsel tried to locate the witness through his friends, without success. The de-

fense counsel stated that she had every reason to expect the witness to cooperate, until the weekend before the trial.

This case is very similar to *Vaughn*. The State had been in contact with Rudell several times, but he had declined to provide an address or telephone number. Instead, Rudell said he could be reached through his attorney. The State would leave a message with Rudell's attorney, and Rudell would call his attorney at certain times to receive his messages. According to the State, this system had been working well. Rudell had promised to appear at the trial and had made efforts to appear at the trial of the codefendant until it pleaded out. The State had written up a subpoena for the witness but did not serve it on him because the State felt it was not necessary. The State had every reason to expect the witness would cooperate until it discovered shortly before trial that the witness might not appear at the trial. At this point, the State made efforts to obtain travel money up front for the witness to induce him to attend trial. The State was able to obtain the money but was unsuccessful in locating the witness.

This situation is more analogous to *Bey* and *Vaughn* than it is to *Kirk* or *Mims*. Thus, the district court did not abuse its discretion by finding that the State had exercised due diligence in unsuccessfully attempting to secure the witness' appearance at trial, thereby finding that Rudell was an unavailable witness.

Finally, the defendant's argument that the witness' testimony was unreliable even if the witness was unavailable is without merit. K.S.A. 60-460(c)(2)(B), the statute which authorizes the hearsay use of prior testimony if the witness is unavailable, has several requirements to insure that the defendant's constitutional rights are not infringed upon. In this case, all of these requirements were met. Further, the problem the defendant has with the reliability of the witness' testimony is questionable. The evidence is that Rudell's affair with Gerald Delay's attorney began after the inquisition and shortly before the preliminary hearing. When Rudell testified at the inquisition, he gave details about the crime and accused the defendant, not Delay, of murdering the victim. The defendant has no evidence that Rudell was engaged in an affair with Delay's attorney and, thus, gleaned details about the crime from her before

he testified at the inquisition. While the defendant did not have the opportunity to cross-examine Rudell at the preliminary hearing about whether his affair with Delay's attorney influenced his preliminary hearing testimony because the defendant was not aware of the affair at the time, this alone does not make Rudell's testimony so unreliable so as to constitute reversible error.

"In cases of necessity, it is generally held that the right of confrontation under the Sixth Amendment and Section 10 of the Kansas Bill of Rights is satisfied if the accused has once been confronted by the witness against him in any stage of the proceedings on the same accusation and has had an opportunity of cross-examination." *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

We do not find error on this issue.

## II. Reasonable Doubt

During the court's voir dire examination of the jurors, one prospective juror responded that she had previously sat on a jury in a civil case. In regard to this statement, the court began discussing the difference between the law in civil cases and the law in criminal cases. The court stated:

"In a civil case, you were probably told that you must decide the case based upon what's more probably true than not true. In other words, in a civil case, 51 percent. If you feel 51 percent one way, that is enough to carry the verdict for that side. In other words, if the scales of justice start out equal, they tip a little bit in the civil case, they win.

"I will be instructing later that the burden of proof in a criminal case is beyond a reasonable doubt. There's no percentage, number, or any quantifying way that I can quantify what beyond a reasonable doubt is. In other words, you must be convinced so that reasonable doubt is not in your mind about whether the—over the issues that you must decide. That doesn't mean that the scales of justice have got to hit the table only on one side so that it's certain, but it is more than 51 percent so that it is beyond a reasonable doubt in your mind. You understand that there is a distinction between civil and criminal cases? And we, as I say, at the end of the case it's appropriate for the Court to instruct you on beyond a reasonable doubt."

Later, while the court was orienting the jury on the important concepts in criminal law such as the presumption of innocence and the State's burden of proof, the court stated:

"And, finally, . . . the burden of proof in this case is proof beyond a reasonable doubt. When you retire to evaluate this case, the test you must use is this: If you have a reasonable doubt as to the truth of the claims made by the State, you should find the defendant not guilty. If you have no reasonable doubt as to the truth of the claims made by the State, you should find the defendant guilty. And as I told you, I cannot quantify that for you any more than what I've just said, but it's more than 51 percent, but it's not required to be certain. Very few things in life are certain. So, you all feel that you can work with the concept of beyond reasonable doubt and apply it? I take it from your response that you can."

At the close of the evidence, the court instructed the jury on the issue of reasonable doubt using language based on PIK Crim. 3d 52.02 (1995 Supp.):

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty."

In this appeal, the defendant objects to the language which the court used at the beginning of the trial, contending that the jury was instructed it could convict the defendant if it was 52% certain the defendant committed the crime.

The State asserts that this commentary was not a jury instruction and should not be analyzed as such. The State points out that the trial court made the reasonable doubt commentary during voir dire at the earliest stages of the trial, while the jury instructions were given at the latest stage of the trial several days later. The State also contends that the reasonable doubt commentary was not a jury instruction because it did not instruct the panel on how to consider evidence. Rather, the State argues that the commentary merely drew a distinction between the different standards of proof for the benefit of the panel members who had previously been on civil juries.

However, the defendant contends that even though the reasonable doubt comments were made to jurors during voir dire, the jurors still could have interpreted these comments as instructions to follow. Further, the court's second jury orientation comments were made immediately after the court gave the standard reasonable doubt instruction, explaining to the jury that this was the stan-

dard it was to use. The judge repeated this standard reasonable doubt instruction (without repeating the orientation comments) to the empaneled jury at the end of the case when all the other instructions were also read to the jury.

In *State v. Gibbons*, 256 Kan. 951, 964, 889 P.2d 772 (1995), the judge oriented the prospective jurors by commenting that each party would present evidence to support its claims. The defense counsel objected to the comments, contending that the court's statement improperly shifted the burden of proof from the State to the defendant. The trial judge denied the defendant's motion to discharge the jury panel, and this court affirmed. In affirming the district court, this court found that the rules regarding improper jury instructions did not apply to its analysis because the commentary meant to orient the jury did not qualify as a jury instruction. 256 Kan. at 964-65.

We hold the trial court's commentary did not qualify as a jury instruction. The comments were not made under the guise of an instruction but, instead, were simply made to inform a potential jury that the burden of proof on a criminal case was different (even greater) than the burden of proof in a civil case. Thus, the question is whether the actual jury instruction regarding reasonable doubt was appropriate. The defendant did not object to the instruction when it was read to the jury at trial. Absent such an objection, this court may reverse only if the instruction was clearly erroneous. *State v. Johnson*, 255 Kan. 252, 257, 874 P.2d 623 (1994).

In *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), the Supreme Court stated that the Due Process Clause of the 14th Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In *Victor v. Nebraska*, 511 U.S. 1, 127 L. Ed. 2d 583, 591, 114 S. Ct. 1239 (1994), the Supreme Court stated that the constitutional question in reasonable doubt instructions "is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard."

In *State v. Whitaker*, 255 Kan. 118, Syl. ¶ 1, 872 P.2d 278 (1994), this court held:

"The pattern jury instructions for Kansas (PIK) have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. . . . However, absent such need [for modification], PIK instructions and recommendations should be followed."

Here, the judge gave the most appropriate jury instruction on reasonable doubt which he could give—the PIK jury instruction. Neither the reasonable doubt jury instruction nor the jury orientation comments made regarding the reasonable doubt standard are clearly erroneous.

### III. Accomplice Testimony

The district judge gave the following instructions to the jury upon the conclusion of the trial. In Instruction No. 10, the judge gave the general witness credibility instruction, which states: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

The district court also instructed the jury as to the accomplice testimony given in the trial under Instruction No. 11 as follows: "An accomplice witness is one who testifies that he or she was involved in the commission of the crime with which the defendant is charged. You should question the testimony of an accomplice if it is not supported by other evidence." At the same time, the jury was instructed in Instruction No. 12: "During this trial, evidence was presented by the reading of testimony of a witness taken under oath at another time and place. It is to be weighed by the same standards as other testimony."

Instruction No. 11 only requires the jury to view the testimony of an accomplice witness such as Rudell with caution "if it is not supported by other evidence." The judge's instruction differed from the PIK instruction regarding accomplice witnesses. PIK Crim. 3d 52.18 (1995 Supp.) states that the jury "should consider with caution the testimony of an accomplice." The PIK instruction

does not condition such caution on whether the witness' testimony is supported by evidence, as the court's instruction did. The defendant does not challenge the alteration of Instruction No. 11 from the PIK standard. Rather, the defendant contends that Instruction No. 12 was in direct conflict with the accomplice witness instruction set forth in Instruction No. 11 and that, read together, Instruction No. 12 was likely to have misled the jury to the detriment of the defendant.

David Rudell and Beth Hebert were both accomplices to the murder of Charles Duty. Rudell was the only eyewitness to the murder who identified the defendant as the killer. Rudell was not produced for trial, and his preliminary hearing transcript was read into the record. Hebert, the other accomplice, testified that Leonard Smith, not the defendant, committed the murder. Instruction No. 11, stating the jury should question the testimony of an accomplice if it was not supported by evidence, applied to the testimony of Rudell and Hebert. Instruction No. 12, stating that testimony read to the jury should be weighed the same as other testimony, only applied to Rudell's testimony.

According to the defendant, the standard for assessing witness credibility if the witness' testimony was read into the record is in direct conflict with the standard for assessing the credibility of a witness accomplice. The defendant points out that the accomplice witness instruction is a diminished credibility instruction in which the jury was specifically instructed to consider with caution the testimony of an accomplice. See PIK Crim. 3d 52.18 (1995 Supp.). On the other hand, the defendant points out that Instruction No. 12 instructs the jury that testimony of a witness taken under oath at another time and place is to be weighed by the same standards as other testimony. The defendant contends that this standard refers the jury back to the general witness credibility instruction, set forth in Instruction No. 10 in this case, which instructs the jury that it is for the jury to determine the weight and credit to be given to the testimony of each witness. See PIK Crim. 3d 52.09 (1995 Supp.). Thus, the defendant contends that Instruction No. 12, which told the jury to consider Rudell's prior testimony read into evidence as it would consider the testimony of any other witnesses,

along with the general witness credibility standard (No. 10), canceled out Instruction No. 11, which told the jury to consider Rudell's accomplice testimony with caution and not to consider the testimony as it would consider the testimony of any other witness.

According to the defendant, the confusion between Instructions Nos. 10, 11, and 12 was especially prejudicial because the only accomplice witness whose testimony was properly weighed with caution under Instruction No. 11 was Beth Hebert, an accomplice who testified in favor of the defendant. Hebert testified that the defendant had nothing to do with the murder of Charles Duty. The defendant asserts that there was a substantial likelihood the jury was misled into viewing the testimony of Hebert with caution as an accomplice witness but only viewing the testimony of Rudell, who testified that the defendant was the killer, as it would view the testimony of any other witness, *i.e.*, without caution (Nos. 10, 12). Due to the fact that the testimony of the two accomplices was given inappropriate weight and the remaining testimony was circumstantial and hearsay, the defendant contends, the confusion among Instructions 10, 11, and 12 constituted reversible error.

There was no specific objection to Instruction No. 12, which instructed the jury to weigh the prior testimony of a witness read at trial as it would weigh testimony of any other witness. Absent a specific objection to an instruction, an appellate court may reverse only if the instructions given are clearly erroneous. *State v. Johnson*, 255 Kan. at 257; *State v. Mason*, 250 Kan. 393, Syl. ¶ 1, 827 P.2d 748 (1992). "An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility that the jury would have returned a different verdict. *State v. Johnson*, 253 Kan. 75, Syl. ¶ 9, 853 P.2d 34 (1993)." *State v. Johnson*, 255 Kan. at 257.

The State contends that Instruction No. 12 only instructed the jury on how to weigh the testimony of a witness which was taken at another time and place. Thus, Instruction No. 12 simply instructed the jury to weigh Rudell's testimony by the same standard that it would weigh the testimony of any other witness who testified at this time and place. Even though it was not clarified in Instruction No. 12, the State contends that the jury was well aware of the

fact Rudell was an accomplice witness. Thus, the jury must have realized that it should weigh Rudell's testimony by the same standards as it would weigh the testimony of any other accomplice witness who testified at trial at this time and place—with caution if not supported by other evidence (No. 11). The jury was well aware that Rudell was an accomplice witness because throughout trial he was consistently presented to the jury as an accomplice. Further, both the State and defense emphasized in closing arguments that Rudell was an accomplice.

When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error even though they may be in some small way erroneous. *State v. Johnson*, 255 Kan. at 257 (citing *State v. Whitaker*, 255 Kan. 118, Syl. ¶ 3). Thus, the State contends that Instruction No. 12 is not clearly erroneous.

PIK Crim. 3d 52.12 Notes on Use recommend that an instruction similar to Instruction No. 12 be given before any recorded testimony is read. This court has also stated that the use of PIK instructions is strongly recommended. *State v. Dunn*, 249 Kan. 488, 492, 820 P.2d 412 (1991). Thus, the trial court did not commit reversible error in giving Instruction No. 12. It is true that the trial court could have altered Instruction No. 12 to clarify that the jury should weigh Rudell's testimony as it would weigh any other accomplice testimony presented at trial, not as it would weigh any other general testimony. See 249 Kan. at 492. However, the absence of such alteration in the jury instruction does not create reversible error. When Instruction No. 12 is viewed in light of Instruction No. 11, it is clear that Rudell's testimony should be viewed with caution as an accomplice witness. There is nothing which indicates that the jury was misled by Instruction No. 12. It appears that the jury read the instructions in light of each other and simply chose to give more credence to Rudell's testimony than to the testimony of Hebert.

## IV. Readback

During voir dire, the defense counsel told the jury that given the expected length of the trial, the jury was not expected to remember each and every piece of information. The defense counsel also told the jurors that if they could not recall certain testimony or were in disagreement about certain testimony during deliberations, they had "a right to send a note out and ask for a clarification or a read-back to clear up that particular concern." The defense counsel told the jury that he points this out in every criminal case because he is surprised at the number of jurors who have told him that they felt stupid for not remembering the testimony and that they did not ask for a readback because they did not want to hold up the judge. The State and the judge allowed the defense counsel to make these comments without objection.

However, just before opening statements, the trial court submitted a "preliminary instruction." The court read the instruction to the jury as a response to the defense counsel's comment during voir dire regarding the jury's right to a readback of testimony. In a conversation with counsel outside the jury's presence, the court stated that it was giving the instruction because it did not "want this jury being invited to request read backs." The court said that the matter of whether a readback is provided is within the discretion of the court. The defense counsel objected, claiming that the jurors are entitled to a readback, and the court responded, "That is not the law, Mr. Johnson." The defense counsel protested further, contending that the instruction "may very well preclude the jury from legitimately making inquiry about something that they don't have recall." The defense counsel argued that if the instruction was given, it would "impose upon the jury an understanding that maybe they should not be allowed to have a read back." The court said that its intent in giving the instruction was to emphasize to the jury that it is to pay careful attention to the testimony at trial and that a readback is a collateral proceeding which may occur only if the court decides it is appropriate. Consequently, the jury was instructed by the court as follows:

"Counsel has mentioned that it is possible to have a read-back of a witness's testimony made by the court reporter. I do not want the jury to misunderstand court procedures, so this is to clarify this situation for you.

". . . It is not always permitted. It is my preference that the jurors give careful attention to the testimony of each witness while they are testifying so their statements may be recalled during deliberations.

"To have a read-back, it is necessary for the court reporter to locate the requested testimony from her notes, then the lawyers, the defendant and the Court must be assembled to agree regarding what will be read-back to the jury. The jury is then brought back into the courtroom for the reporter to read the questions and the answers. The read-back, once commenced, will take about as long as the original testimony.

"If there is a specific question in relation to what a particular witness said, the testimony can be re-read to you. However, if the jury's disagreement is over the meaning of the witness's testimony or its significance, a read-back will usually not resolve that disagreement."

After reading the instruction to the jury, the court told the jury that it "was concerned that [the jury] would be relying on a read back at some point in time" and the court did not want the jury "to try the case twice." The jury did not make a request for a readback of any testimony during their deliberations.

While these comments were made to the jury before opening statements occurred, the trial judge referred to the comments as a "preliminary instruction." Since these comments were considered jury instructions and not considered mere jury orientation comments, they will be analyzed under the jury instruction case law.

When the court asked either counsel if they had any objection to the preliminary instruction, the defense counsel responded, "Your Honor, we would simply object from the standpoint it appears to diminish the fact that the jurors are entitled to a readback, I think." After discussing the language of the instruction with the judge, the defense counsel eventually stated in regard to the instruction, "I've got no problem with that. . . . Then, that's fine." Based on this language, the State contends that the defendant did not specifically object to the court's instruction but in fact participated in selecting the specific language to be used, thereby waiving his right to appeal this issue. However, the defendant correctly points out that even if he did not specifically and properly object to the instruction, the instruction may still constitute reversible error if it is clearly erroneous. *State v. Johnson*, 255 Kan. at 257.

The State contends that the instruction merely reaffirmed and clarified the defense counsel's statements which were made during voir dire. For instance, the trial court specifically instructed the jury that "testimony can be re-read to you" if the jury has a "specific question in relation to what a particular witness said." All the trial court did was explain to the jury that a readback could be a time-consuming procedure and stressed to the jurors that they should pay careful attention to the testimony of each witness as it was given.

The defendant points out that the court also told the jurors that they were not *entitled* to a readback and that the decision to have a readback was within the court's discretion. The defendant contends that this is an incorrect statement of the law.

In making this argument, the defendant cites to *State v. Myers*, 255 Kan. 3, 8, 872 P.2d 236 (1994). In *Myers*, the jury requested a readback of certain testimony and the district court denied the request. Upon appeal, this court found that this denial constituted reversible error. 255 Kan. at 9. The discussion in *Myers* centered on the interpretation of K.S.A. 22-3420(3), which states:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

The *Myers* court pointed out that K.S.A. 22-3420(3) *requires* a trial court to read back testimony to the jury when a jury so requests. Although the manner in which the court complies with the jury request is a matter of discretion, the trial court does not have discretion to deny a jury's request for a readback of testimony. 255 Kan. at 6 (citing *State v. Redford*, 242 Kan. 658, 667-68, 750 P.2d 1013 [1988]).

Thus, the defendant contends that the district court was incorrect when it instructed the jury that "[w]hether or not a read-back of testimony will be allowed after the jury has retired to deliberate, is a matter within the discretion of the judge. It is not always per-

mitted." The defendant argues that this constitutes reversible error, as the jury instruction contained an incorrect statement of law.

The State argues that *Myers* is distinguishable from this case. In *Myers*, the judge flatly denied the jury's request for a readback. In this case, the court did not deny a readback request, it simply explained that while a readback was permissible, it was complicated and not encouraged.

A trial court has discretion in giving instructions to the jury. On appeal, the instructions should be approved if, after being considered in their entirety, they properly and fairly state the law as applied to the facts. *Johnson*, 255 Kan. at 256 (citing *State v. Hamons*, 248 Kan. 51, Syl. ¶ 5, 805 P.2d 6 [1991]). If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. *Johnson*, 255 Kan. at 257 (citing *State v. Whitaker*, 255 Kan. 113, Syl. ¶ 3).

Here, the trial judge misstated the law in this jury instruction. If a jury requests a readback, whether such readback will be allowed is *not* within the discretion of the judge, as the trial court instructed. However, read in its entirety, the jury was not misled by the instruction. Later in the instruction, the court stated that "[i]f there is a specific question in relation to what a particular witness said, the testimony can be re-read to you." As such, the jury was informed that readbacks are allowed but that the manner in which readbacks are allowed is within the trial court's discretion so that the case is not tried twice. Thus, if the jury had desired a readback, the instruction did not mislead the jury into believing that readbacks are not allowed and that it should not request one. The instruction does not constitute reversible error.

The defendant contends that the instruction was not only clearly erroneous because it misstated the law, but was also erroneous in that it had a chilling effect on the jury to request a readback. According to the defendant, these comments sent the jury a message that readbacks are undesirable and unfeasible and should not be requested. The defendant contends that the trial court adversely interfered with the jury process by chilling any jury desire to re-

quest a readback, thereby denying the jury, in advance, information to which it was entitled. In making this argument, the defendant quotes *Myers*, 255 Kan. at 6:

" 'There are obviously points in the testimony of the witnesses which lean to the side of the prosecution and points at which that testimony could be construed as being beneficial to the defense. The value of this testimony was for the jury alone to judge. By denying the jury information to which it was entitled, the jury process was adversely affected. A keystone of criminal procedure in this country is the jury process, which is used to adjudicate guilt or innocence. Anything which adversely affects this process cannot possibly be beneficial. At this point, no one can say why the jury wanted the information or what it would have decided if it had gotten it. The jury process is too central to our system of criminal justice to permit it to be manipulated or compromised in any way.' "

The defendant concedes that it is impossible to know whether the jury would have requested a readback in the absence of the instruction or whether such readback would have caused the jury to return a different verdict. However, the defendant contends that the instruction may have prevented the jury from requesting a readback which it may have desired, thereby constituting reversible error.

We do not believe the instruction was so strong as to prevent the jury from requesting a readback under the assumption that it would be denied even though it desired one. Instead, the instruction encouraged the jury to listen to the evidence as it was presented. The judge did not want the jury to ignore the evidence presented during the trial with the expectation that it could evaluate the evidence at a later time during a readback. The judge also specifically clarified that testimony could be read back to the jury when it would be helpful. "An instruction is clearly erroneous when the reviewing court reaches a firm conviction that if the trial error had not occurred, there was a real possibility that the jury would have returned a different verdict." *Johnson*, 253 Kan. 75, Syl. ¶ 9. This possibility did not exist here. The instruction was not clearly erroneous and does not constitute reversible error.

### V. Heinous, Atrocious, or Cruel Manner

The defendant contends that the evidence is insufficient as a

matter of law to prove the murder was committed in a particularly heinous, atrocious, or cruel manner.

The following are additional facts which are necessary to analyze this issue: Rudell testified that the defendant shot Charles Duty while he was in bed. Rudell said that he saw Duty "lying in the bedroom about half in and half out of bed." Rudell observed that Duty's feet were tangled in the bed sheet and that "his head and shoulders [were] up over the bed." Rudell testified that when he saw Duty's body in this position, it was twitching.

The coroner testified that Duty had been shot once in the chest and once in the back. The coroner also testified that Duty died as a result of hemorrhaging from the bullet wound that entered the front of his chest. Further, the coroner stated that the victim's teeth had been removed and the victim's tattoos had been cut out after the victim was already dead.

K.S.A. 1992 Supp. 21-4628 permits the State to seek a sentence of imprisonment for life without the possibility of parole for 40 years if the defendant is convicted of first-degree premeditated murder. K.S.A. 1992 Supp. 21-4624(5) states that if a jury by unanimous vote finds that one or more aggravating circumstances exist beyond a reasonable doubt and the aggravating circumstances are not outweighed by any mitigating circumstances, then the defendant shall be sentenced to the hard 40 sentence.

Upon the defendant's conviction, the State requested that the jury recommend a hard 40 sentence based on two aggravating factors—one, that the defendant knowingly and purposefully killed the victim in a particularly heinous, atrocious, or cruel manner (based on K.S.A. 1992 Supp. 21-4625[6]) and two, that the defendant committed the crime in order to avoid lawful arrest or prosecution (based on K.S.A. 1992 Supp. 21-4625[5]).

In regard to the first aggravating circumstance, the jury was instructed as to the definition of heinous, atrocious, and cruel:

"(a) The term 'heinous' means extremely wicked or shockingly evil;

"(b) The term 'atrocious' means outrageously wicked and vile;

"(c) The term 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or the enjoyment of the sufferings of others.

"A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to his ultimate fate."

Further, the State attempted to persuade the jury in closing argument at the sentencing phase that the defendant killed the victim in a heinous, atrocious, or cruel manner. The State told the jury:

"I want you to think about the time it takes for a person to die after they've been shot twice; once in the chest and once in the back. I want you to think about what they're thinking during that period of time, as short as it may be, before they lose consciousness and then eventually die from loss of blood due to those wounds.

"What's going through their mind at that point in time? First, they see the gun barrel pointed at them. Then they hear the sound of the gun going off, the cloud of blue smoke, and the pain almost instantaneously that's associated with that bullet entering their skin, going through their organs, causing the blood loss in this case. In that fleeting moment are they wondering, 'Is this it? Am I going to die at this point in time?' And then it's not even over, because that's only the first bullet shot, and you've got one more bullet shot to go. Now, I want you to think about that."

In an apparent attempt to persuade the jury that the second aggravating circumstance, avoiding lawful arrest or prosecution, also existed, the State told the jury that it should "consider what happened to Charles Duty after he was killed in this case." In regard to the mutilation of Duty's body after he was dead, the State said:

"One of the aggravating circumstances the State has alleged is that the defendant committed this crime in order to avoid a lawful arrest or prosecution. As bad as it seems, it's horrible to kill somebody, but it did not stop there in this case.

"In order to prevent that arrest or prosecution, a decision was made that the identity of Charles Duty had to be destroyed. And in order to do that, they had to remove the tattoos. And I use the word 'they.' The defendant in this case. And in order to remove the tattoos, you don't walk up to Charles Duty's arm and take your finger and pull off the skin. It doesn't happen that way.

"An instrument, a sharp instrument, fairly sharp instrument according to Doctor Scamman, was used, and that instrument, you have to grab the skin, and you have to cut, and you have to basically saw back and forth, back and forth, back and forth. And that's only one cut. You saw the size of the tattoo, the size of the skin that was removed. That's got to go all the way around the skin cutting through a

muscle, cutting through skin, whatever else is in there to remove that section of the identifying mark of Charles Duty.

"And then, again, you're not even done because that's only one arm. You've got to go to the other arm, to avoid the arrest and prosecution, you've got to remove the other tattoo, too. And you've got to saw through the skin and the muscle once again, over and over, to remove it.

"And then you're not even done at that point in time, because you've got to remove the teeth. The teeth that have to be removed. Ladies and gentlemen, when you—you don't simply take your finger like you're unscrewing a light bulb and pull out the teeth. We know that. You've got to have an instrument, a pair of pliers perhaps, something with a grip on them, and then you've got to take them in there and ratch it back and forth, back and forward, pulling and racheting until that tooth comes out, and then you've got to do it to each and every other tooth that's in the upper jaw and the lower jaw simply to prevent an identification. And in order if you prevent that identification, you prevent this lawful arrest and prosecution."

The jury found unanimously that the first aggravating circumstance existed beyond a reasonable doubt—that the defendant knowingly and purposefully killed the victim in a particularly heinous, atrocious, or cruel manner. The jury did not find that the second aggravating circumstance existed—that the defendant committed the crime in order to avoid lawful arrest and prosecution. The jury found that the existence of one aggravating circumstance was not outweighed by any mitigating circumstances; thus, the jury recommended a hard 40 sentence.

At the sentencing, the State asked the judge to follow the jury's recommendation and impose a hard 40 sentence. In response to this request, the court asked the State to articulate the evidence which it believed supported the jury's finding that the crime was committed in a particularly heinous, atrocious, or cruel manner. The State contended that the removal of the victim's teeth and tattoos after his death supported this aggravating circumstance. Further, the State argued that the defendant's motive, opportunity, and intent behind the crime supported this aggravating circumstance that the defendant killed the victim in a particularly heinous, atrocious, or cruel manner. The State points out that the victim was an AIDS patient who sold his prescription drugs. Further, part of the defendant's motive behind this crime was that his common-law wife, Hebert, had stolen some of the victim's drugs and the

defendant was worried about a confrontation with the victim. The State also contends that the fact the victim was killed while he was in bed with no chance to defend himself supports this aggravating circumstance. Further, the victim was shot twice, with some degree of suffering before he died.

The judge accepted the jury's recommendation and sentenced the defendant to prison for life without the possibility of parole for 40 years. In so doing, the judge made the following comments:

"This case, as I see it, presents a rather close question of law. It does turn on the issue of heinous. The Court has reviewed the case of *State versus Kingsley*, . . . [and] the case says clearly that the subsequent abuse of a body does not—would not constitute the manner in which the murder was committed and, therefore, does not support aggravated circumstances such as . . . heinous, atrocious and a cruel manner, which the jury found. The Court, in that case, also quoted from the Nebraska case which, of course, they have capital punishment, but the Nebraska Court there stated that, to have an aggravating circumstance, it must be something more than the inherent nature of killing itself.

"The language in that case concerns me greatly in this case because the period of time that's involved is rather short. The cases that have gone up in Kansas so far have been situations where people were abused and injured over a period of time and eventually killed.

"On the other hand, I have a jury finding before me that if I were to set it aside, I have to find that there's no evidence to support that finding. And that standard of review is also hard. The jury heard all of the evidence. I believe they were properly instructed in the case. And they found that aggravating circumstances of—that the murder was especially heinous, atrocious and cruel.

"I think that there is evidence that Mr. Duty was killed without warning or provocation, he was an unsuspecting guest in the home while Mr. Cook was in the process of moving. He may or may not have been asleep. We don't know. That would support a finding of heinous and atrocious. Cruel because of the manner in which it was done, again, without provocation, shows another indifference to human life. If I were to go on a sentence of eligibility for parole in 15 years, the Supreme Court, I don't believe, could reverse me and give the hard 40. On the other hand, if I give the hard 40 and they conclude that there is evidence to support, they can—or that the evidence is not there to support the hard 40, they can reduce that. . . . [I]t's my conclusion that in this case, and because it is a new statute and a new area of law, I'm going to go with the conservative, what I believe to be the conservative view and impose the hard 40. If the Supreme Court feels that the evidence is not there, then, they may modify the sentence and reduce it down. As I say, they could not do the converse if I went with less."

K.S.A. 1992 Supp. 21-4627 states:

"(1) A judgment of conviction resulting in a mandatory term of imprisonment pursuant to [murder in the first degree] shall be subject to automatic review by and appeal to the supreme court of Kansas . . . .

. . . .
"(3) With regard to the sentence, the court shall determine:

. . . .
(b) Whether the evidence supports the findings that an aggravating circumstance . . . existed . . . ."
"When the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Alford*, 257 Kan. 830, Syl. ¶ 3, 896 P.2d 1059 (1995).

The defendant appeals the hard 40 sentence, contending that the evidence is insufficient as a matter of law to support the jury's finding that the crime was committed in a particularly heinous, atrocious, or cruel manner.

### Post-death Mutilation

In *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993), the defendant was convicted of murder, and the jury recommended the hard 40 sentence based on the finding that the defendant committed the crime in an especially heinous, atrocious, or cruel manner. K.S.A. 1992 Supp. 21-4625(6). The defendant argued that any mutilation which occurred after the victim was dead should not be relevant in determining whether the aggravating circumstance existed, and this court agreed. In so finding, the court stated: "The murder is complete with the death of the victim. Subsequent abuse of the body would not constitute the manner in which the murder was committed. Thus, the jury was correctly instructed that the torture or serious physical abuse of the victim must precede death." 252 Kan. at 792.

In *State v. Willis*, 254 Kan. 119, 130, 864 P.2d 1198 (1993), this court specifically approved of certain sentencing instructions which are to be used when the jury is determining if the crime was committed in an especially heinous, atrocious, or cruel manner under 21-4625(6). These instructions were used in this case and state in

part: "A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse *before* the *victim's death*." (Emphasis added.)

Finally, while the defendant does not cite *State v. Reed*, 256 Kan. 547, 886 P.2d 854 (1994), it is also relevant to this issue. In *Reed*, the court reversed the jury's finding that the defendant committed the murder he was convicted of in an especially heinous, atrocious, or cruel manner due to insufficient evidence. This court found that even if the evidence was viewed in the light most favorable to the State, the evidence failed to establish that the victim was stabbed and decapitated while she was still alive. 256 Kan. at 562-63.

The defendant contends that it is undisputed the teeth and tattoos were not removed from victim's body until after the victim was dead. According to defendant, it is clear from the above cases that post-death mutilation is not relevant to the determination of whether the crime was committed in an especially heinous, atrocious, or cruel manner. The defendant contends that the jury incorrectly relied on this mutilation evidence in finding that the aggravating circumstance existed due to the State's emphasis on the evidence in its closing argument. The State does not address this issue in its brief, but conceded at oral argument that post-death mutilation could not be used to determine whether the crime was determined in especially heinous, atrocious, or cruel manner.

The law is clear that this aggravating circumstance only exists if the defendant behaved in a heinous, atrocious, or cruel manner during the commission of the crime while the victim was still alive. Evidence of post-death mutilation is insufficient to support a finding of this aggravating circumstance.

### Gunshot

The general rule in Kansas is that "deaths caused by shooting do not result in a finding that the manner in which they were conducted was heinous, atrocious, or cruel." *State v. Alford*, 257 Kan. at 838 (citing Malone, *The Kansas "Hard-Forty" Law*, 32 Washburn L.J. 147, 156 [1993]). However, there are a few exceptions to this rule in which the defendant shot the victim and was

still found to have committed the crime in a particularly heinous, atrocious, or cruel manner. For instance, in *Alford*, this court found there was sufficient evidence to conclude that defendant committed murder in a particularly heinous, atrocious, or cruel manner even though he killed the victim by shooting her with a gun. 257 Kan. at 838. This finding was based on the following facts:

"[T]he defendant entered the kitchen waving his gun. He chased Jackson into the lobby of the restaurant and shot her twice. He then forced Jackson back into the kitchen and when she attempted to flee, shot her again. Finally, as she was barely moving yet still trying to escape, he dragged her around the corner of the kitchen, all the while attempting to fire the gun which had jammed. After a long series of clicks from the jammed gun, he administered the final two bullets." 257 Kan. at 838.

The defendant points out that *Alford* is an exception to the general rule that shooting deaths are not typically committed in a heinous, atrocious, or cruel manner. See *State v. Willis*, 254 Kan. at 129 ("The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases.").

The defendant attempts to distinguish *Alford* from this case by contending that there must be additional egregious conduct, above and beyond the shooting itself, for a homicide shooting to be conducted in a heinous, atrocious, or cruel manner. Annot., 63 A.L.R.4th 478. The defendant contends that the killing in *Alford* was preceded by substantial physical abuse and torture, while the crime in this case involved nothing out of the ordinary in terms of a shooting death to support a finding that it was committed in a particularly heinous, atrocious, or cruel manner. The defendant asserts that the victim was shot twice in rapid succession and died from a gunshot wound to the chest.

The State points out that the defendant shot the victim twice, once in the chest and once in the back, while the victim was in bed as a defenseless AIDS patient. Further, the coroner testified that Duty died as a result of hemorrhaging from the bullet wound that entered his chest. According to the State, the jury could have reasonably inferred that death by hemorrhage is not instantaneous. Further, the jury could surmise that Duty had time to experience

pain and suffering before he bled to death based on the fact that Duty was shot more than once, his legs were tangled in the bed sheet, his head and shoulders were raised above the bed, and he was twitching. In fact, the State contends that based on the two gunshot wounds, the victim was either facing the defendant and turned away to prevent being shot again or was shot in the back and turned to see who shot him. According to the State, this pain, suffering, fear, and knowledge of impending death experienced by the victim before he bled to death was similar to the type of torture which the victim in *Alford* experienced before her own death. The State concedes that the victim's "torture" in this case did not last as long as the victim's torture in *Alford*. However, the State contends that this difference is irrelevant because any form of torture can be seen as heinous, atrocious, or cruel. Thus, the State asserts that the evidence indicates the defendant engaged in conduct above and beyond the mere shooting itself and that such evidence is sufficient to permit a rational factfinder to conclude that the crime was committed in a particularly heinous, atrocious, or cruel manner beyond a reasonable doubt.

All murders are heinous, atrocious, and cruel. The legislature, by using the phrase "in a particularly heinous, atrocious, or cruel manner," meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases. Even when this evidence is viewed in the light most favorable to the prosecution, a rational factfinder could not find that the shooting was committed in a special or unusual degree or to an extent greater than in other cases so as to support the existence of the aggravating circumstance that this crime was committed in a particularly heinous, atrocious, or cruel manner beyond a reasonable doubt. Most of the State's arguments regarding "torture" experienced by the victim in this case are based on conjecture or speculation. Since the jury did not find any other aggravating circumstance, the defendant's hard 40 sentence is set aside, and the case is remanded to the trial court for resentencing.

Conviction affirmed, sentence vacated, and case remanded for resentencing.