No. 71,633

STATE OF KANSAS, *Appellee*, v. BRENT L. ALFORD, *Appellant*.

(896 P.2d 1059)

Opinion filed June 2, 1995.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for the appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a direct criminal appeal by the defendant Brent L. Alford from convictions, following a jury trial, of first-degree murder, K.S.A. 1992 Supp. 21-3401; aggravated kidnapping, K.S.A. 21-3421; and unlawful possession of a firearm, K.S.A. 1992 Supp. 21-4204. He was sentenced to the "hard 40" on the murder charge, life on the aggravated kidnapping charge, and 3 to 10 years on the firearm charge. The sentences on the aggravated kidnapping and firearm charges were ordered to run concurrent with each other but consecutive to the hard 40 sentence.

The defendant argues that the jury's determination that his killing of the victim was committed in an especially heinous, atrocious, and cruel manner is not supported by sufficient evidence and that the jury instruction on "heinous, atrocious and cruel manner" was unconstitutionally vague. He also contends that the district court erred in admitting a written statement prepared by the victim regarding a previous aggravated battery incident and that the district court erred in admitting photographs of injuries suffered by the victim in that previous incident. Finally, he contends that his conviction for aggravated kidnapping should be reversed because there was insufficient evidence to support one of the means by which

the offense was alleged to have been committed. Finding no reversible error, we affirm.

The defendant and Kim Jackson first met in Oklahoma in 1983 and began dating in 1984. In 1988, the couple began living together and resided together until 1990 when the defendant moved to Wichita to obtain employment. Two months later, Jackson joined the defendant in Wichita, and the couple resumed living together.

In December 1992 and January 1993, Jackson related to a friend, Jeff Jones, that she was involved in a bad relationship that was "going down." On January 8, 1993, Jackson went to Jones' apartment crying. She told Jones that the defendant had beaten her. She also told Jones that the defendant had stated that if she left him, he would get his cousin to kill her. Jackson moved into Jones' apartment.

On January 13, 1993, Jackson called Jones from Burger King, her place of employment, and stated that she was going to the defendant's apartment to get the rest of her belongings. When she did not return after several hours, Jones became concerned and called the police, asking them to go to the defendant's apartment and check on Jackson's welfare.

At trial, Wichita police officer James Pinegar testified that he had gone to the apartment to check on Jackson. When he arrived, the defendant opened the door. Officer Pinegar stated that he entered the apartment and found Jackson huddled in the corner by the bed, crying. She was dressed only in a nightgown and had blood on her face. There was also blood on the sheets and pillowcase.

Jackson told Officer Pinegar that the defendant had taken a razor blade and held it up to her cheek. She stated that the defendant would ask her if she was "fucking" Jones and that when she answered that she was not, he cut her face with the razor. Jackson told Officer Pinegar that the defendant also cut her with a tile knife, punched her in the stomach, hit her on the head with a hammer, and, at one point, scratched her leg with the claw of the hammer. Officer Pinegar arrested the defendant for aggravated battery.

The State introduced several photographs taken at the defendant's apartment to show the injuries suffered by Jackson. The defendant objected, claiming that the prejudicial effect of the pho-

tographs outweighed their probative value. The State also sought to introduce a written summary of the incident, which Jackson had prepared at the suggestion of Jones. Although the defendant had previously objected to the introduction of this statement before trial, he did not object at trial.

Melaura Guider, one of Jackson's co-workers, testified that around February 1, Jackson told her that the defendant had called and asked if she was going to get their television out of the pawn shop. This call scared Jackson, and she called the jail to verify that the defendant was still incarcerated and had not bonded out on the aggravated battery charge.

The defendant was able to bond out of jail on February 11, 1993. Kirk Gillett, one of the defendant's co-workers with whom he began staying, testified that the defendant talked about Jackson and had stated that if he had to go to jail, he ought to do something to earn it.

Guider testified that in late February, Jackson told her the defendant had called and said, "Bitch, I could have got you last night while you was getting the groceries out of your car." Guider stated that Jackson was terrified that the defendant would kill her. According to Guider, the defendant later called Jackson and told her, "I could have killed you last night while Jeff was at work." On February 28, the defendant left a note on Jackson's mailbox saying that he would see her at work after 5 p.m. Jackson was too scared to go to work that day. Jones also testified that Jackson told him the defendant had called her at Burger King and stated that there was something he had to do before he went back to jail. This contact led to the filing of a motion to revoke the defendant's bond.

Mark Dinsmore, another Burger King employee, testified that on the afternoon of March 5, a man called and asked for Jackson. When Jackson picked up the phone, the man hung up. Guider testified that later that afternoon, Jackson was waiting on a customer in the drive-thru when the defendant walked into the kitchen through the door leading from the restroom. The defendant was carrying a gun in his hand.

Guider stated that the defendant forced her away from the door and yelled for everyone to get into the office. Jackson then ran out

the door into the lobby in an attempt to escape. The defendant ran after Jackson and shot her twice. Jackson was bent over; the defendant pushed her through the door back into the kitchen. As they were going through the kitchen, Jackson suddenly grabbed a basket of fries from the fryer and threw them at the defendant. The defendant slid on the hot grease and fell against the bun warmer. He then shot Jackson again.

Jackson was still on her feet. The defendant grabbed her by the neck and began dragging her towards the back. According to Guider, the defendant was attempting to shoot Jackson again, but the gun was jammed. The defendant took Jackson around a corner; Guider kept hearing clicks from the jammed gun and then heard two shots. Guider then heard the back door being opened. The defendant was later arrested running from the scene. The gun used in the shooting, a .25 caliber semiautomatic, was recovered from a nearby trash dumpster.

Jackson died later that night. An autopsy revealed that she had suffered three gunshot wounds to the head, a wound to the lower right side, two wounds in the left arm, and a wound to the upper left back. Dr. Eckert, the doctor performing the autopsy, testified that Jackson died as the result of one of the gunshots to the head. He stated that the fatal wound would likely cause a person to become unconscious.

The defendant's version was slightly different. He stated that he and Jackson were happy until mid-1992 when they began to do crack and he began to drink heavily. The defendant stated that Jackson moved out for a few days and then moved back in but that afterward she began "messing around" with a man named Randy. For awhile they tried to repair their relationship. However, on January 13, he came home to find Jackson packing up their joint property. An argument ensued during which Jackson grabbed a razor and threatened him. The defendant stated that he threw a hammer at her, hitting her in the leg, and then hit her with a broom, knocking the razor from her hand. He then picked up the razor and slashed Jackson's cheek twice "on reflex."

The defendant admitted calling Jackson while in jail but stated that he was only trying to get his television set and some of his

guns back. He stated that when he returned from jail, all of his personal property was gone. He testified that he received a call from the Health Department stating that he had been exposed to a disease and was terrified that Jackson had given him AIDS. Thomas J. Ebben of the State Health Department verified that he had contacted the defendant but stated he told the defendant he had been exposed to syphilis and that he should come in and get tested. Ebben stated that the defendant did not show up for his test.

On the day of the shooting the defendant told his boss that he could not work because he had to appear at a bond hearing. He cashed his paycheck at Dillon's and took a bus from the Tower Motel, where he had been staying, to the Auto Motel, which was near the Burger King where Jackson worked. He did not go to the bond hearing that day because he expected to be put back in jail and wanted to recover his personal property before he went back to jail.

After going to the motel, the defendant went to a pawn shop to buy a gun because he planned to go to Jones' apartment in search of his property and a friend had told him that Jones had threatened to kill him if he came near Jones' apartment. The defendant testified that he went to Jones' apartment, but no one was home. He then visited a friend's house nearby and then went back to his motel room. He later returned to Jones' apartment but again no one was home. According to the defendant, he consumed a couple of shots of Seagram's 7 and five or six beers while in his motel room.

The defendant testified that upon his return to the motel, he saw Jackson working at Burger King. He got off the bus because he wanted to scare Jackson so that she would respect him. According to the defendant, he went into the kitchen and told the person at the door to back off. He then pulled out his gun and asked Jackson where his property was. Jackson slapped him and he chased her. Jackson stated that she did not believe the gun was real, so he put the ammunition clip in the gun. He stated that Jackson then tried to kick him in the groin, and the gun accidentally discharged. The defendant testified that Jackson did not appear to be hurt and told him that she would get his property. As she lead him through the kitchen, she threw some fries at him, and he fired

a shot. He then slipped in the grease and began firing randomly. The defendant testified that he did not intend to kill Jackson and he thought he was shooting at her legs.

The defendant stated that after shooting, he ran out the door and began running down the street. After hiding the gun in the dumpster, he was starting back to Burger King to check on Jackson when he was apprehended.

The jury found the defendant guilty of first-degree murder, aggravated kidnapping, and unlawful possession of a firearm. The jury then convened to determine whether the defendant should receive the hard 40 for his first-degree murder conviction. The jury found that the crime was committed in an especially heinous, atrocious, and cruel manner and recommended imposition of the hard 40.

## JURISDICTION

Before any discussion of the errors raised by the defendant, we must address a threshold question concerning this court's jurisdiction. The defendant was sentenced on August 20, 1993, but his notice of appeal was not filed until February 7, 1994. There is no question that the notice of appeal was filed out of time. Ordinarily, this would be a jurisdictional defect and the appeal would have to be dismissed. See *State v. McDaniel*, 249 Kan. 341, 344, 819 P.2d 1165 (1991). However, the defendant argues that K.S.A. 1992 Supp. 21-4627(1) provides for automatic review and that a timely filing is not necessary.

K.S.A. 1992 Supp. 21-4627(1) provides that a conviction resulting in imposition of the hard 40 "shall be subject to automatic review by and appeal to the supreme court of Kansas in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure." The defendant claims that this provides for automatic review and, therefore, this court has jurisdiction notwithstanding his failure to file a timely notice of appeal.

This is a question of first impression in Kansas. K.S.A. 1992 Supp. 21-4627(1) does provide that the conviction shall be subject to automatic review. It also states that the appeal to the Supreme Court must be made in accordance with the applicable statutes governing appellate procedure. However, as noted by the defen-

dant, if the legislature had meant to make an appeal of the hard 40 subject to the same time limitations as other criminal appeals, there would have been no need to use the language "shall be subject to automatic review."

The language in K.S.A. 1992 Supp. 21-4627(1) cannot be read as merely specifying in which court the appeal is to be heard. Under K.S.A. 1992 Supp. 22-3601(b)(1), any class A felony may be appealed directly to the Supreme Court subject to the normal time limitations. If those limitations were meant to apply in hard 40 cases, the "automatic review" language would be reduced to mere surplusage. Therefore, the legislature must have intended that automatic review mean something more than review subject to the normal restrictions of appellate practice. There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992).

Moreover, the phrase "automatic review" cannot be interpreted as simply mandating that the Supreme Court take every case in which the hard 40 is imposed since this court is bound to take every class A felony appeal under K.S.A. 1992 Supp. 22-3601(b)(1). Thus, the only possible interpretation of the phrase "automatic review" is that review must be given even though the criminal defendant fails to properly follow the normal procedural rules for perfecting the appeal. Instead, the appeal is commenced automatically upon the imposition of the hard 40 sentence. Based on the language of K.S.A. 1992 Supp. 21-4627(1), this court has jurisdiction to hear the defendant's appeal.

## SUFFICIENCY OF EVIDENCE CONCERNING HEINOUS, ATROCIOUS, AND CRUEL MANNER

The defendant contends that the jury's determination that his killing of Jackson was committed in an especially heinous, atrocious, and cruel manner is not supported by the evidence. He argues that the murder was simply a routine shooting and did not contain the type of conduct for which the hard 40 sentence is appropriate.

When the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sen-

tence proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt. *State v. Reed*, 256 Kan. 547, 564, 886 P.2d 854 (1994).

For purposes of the hard 40 sentence, the term heinous means "extremely wicked or shockingly evil"; atrocious means "outrageously wicked and vile"; and cruel means "pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others." See *State v. Bailey*, 251 Kan. 156, 174, 834 P.2d 342 (1992).

Generally, deaths caused by shooting do not result in a finding that the manner in which they were conducted was heinous, atrocious, or cruel. See Malone, *The Kansas "Hard-Forty" Law*, 32 Washburn L.J. 147, 156 (1993), stating that, as a general rule, deaths caused by stabbing, bludgeoning, strangling, burning, or drowning often result in a finding of this circumstance, while deaths from shooting do not. However, in this particular case, there was sufficient evidence to conclude that Jackson was killed in a heinous, atrocious, or cruel manner.

The record reveals that the defendant entered the kitchen waving his gun. He chased Jackson into the lobby of the restaurant and shot her twice. He then forced Jackson back into the kitchen and when she attempted to flee, shot her again. Finally, as she was barely moving yet still trying to escape, he dragged her around the corner of the kitchen, all the while attempting to fire the gun which had jammed. After a long series of clicks from the jammed gun, he administered the final two bullets. Based on these facts, the jury's determination that the murder was committed in an especially heinous, atrocious, or cruel manner is supported by substantial competent evidence.

## JURY INSTRUCTIONS REGARDING HEINOUS, ATROCIOUS, AND CRUEL

The defendant contends that the jury instruction defining the terms heinous, atrocious, and cruel was unconstitutionally vague. The instruction given to the jury stated, in pertinent part:

"The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked or vile; 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others."

This court has found that the terms "heinous," "atrocious," and "cruel" are not so vague as to be unconstitutional. *State v. Bailey*, 251 Kan. 156, 174-175, 834 P.2d 342 (1992). However, in *State v. Willis*, 254 Kan. 119, 130, 864 P.2d 1198 (1993), we supplemented the instruction approved in *Bailey* and cases that followed by adding the phrase, "A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate." 254 Kan. at 130. *Willis* stated that the instruction should be used in "all cases on appeal as of the date of this opinion in which the vagueness of a 21-4625(6) sentencing instruction has been asserted as an issue on appeal." 254 Kan. at 130.

The defendant argues that because his case was on appeal at the time *Willis* was handed down, the ruling should necessarily apply to him. However, in *State v. Duke,* 256 Kan. 703, 887 P.2d 110 (1994), we stated:

"Our statement in *Willis* should be modified as follows: 'We adopt the instruction to be used in: (1) Willis' retrial, (2) hard 40 sentencing cases after the date of this opinion, and (3) all cases on appeal as of the date of this opinion in which vagueness of a 21-4625(6) sentencing instruction has been asserted *in the trial court and* as an issue on appeal.' 254 Kan. at 130." 256 Kan. at 717.

The modification of *Willis* in *Duke* makes it clear that the vagueness of the sentencing instruction must be asserted in the trial court as well as on appeal. While the defendant acknowledges that no such assertion was made by him at trial and while he also acknowledges our decision in *Duke*, he nevertheless argues that *Duke's* attempt to limit the application of *Willis* is contrary to the rules established by both this court and the United States Supreme Court regarding the application of overruling decisions. Relying on our decision in *State v. Waterberry*, 248 Kan. 169, 172, 804 P.2d 1000 (1991), and cases cited therein, he argues that the proper procedure and general rule in criminal cases is that an overruling

decision should be applied retroactively to all similar cases pending at the time the decision was rendered.

The problem with the defendant's argument is that *Willis* is not an overruling decision. Contrary to the defendant's contention, *Willis* did not overrule *Bailey*. Instead, we stated in *Willis* that we were merely supplementing the instruction on the definition of heinous, atrocious, and cruel. Thus, as we clearly stated in *Duke*, the failure to give the supplemental instruction set forth in *Willis* regarding the terms "especially heinous, atrocious, or cruel manner" will not be considered in a vagueness argument except in those cases where the same argument was presented to the trial court and the appellate court. 256 Kan. at 717.

## ADMISSION OF THE WRITTEN STATEMENT PREPARED BY THE VICTIM REGARDING AN EARLIER AGGRAVATED BATTERY

The defendant contends that the court erred in admitting a written statement prepared by Jackson, at the suggestion of Jones, regarding the earlier aggravated battery. He argues that the statement was inadmissible hearsay.

The defendant did not object to the admission of the written statement. He did object prior to trial but did not renew the motion at the time the statement was offered into evidence. When a pretrial motion to suppress is denied, the defendant must make a timely objection at trial to the introduction of the evidence, specifying the ground for the objection in order to preserve the issue for appeal. *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993).

In any event, the statement was admissible. The State sought to introduce the evidence of the prior aggravated battery to show discord rather than to prove the truth of the matter asserted. Evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent. *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d 1140 (1983). This rule is equally applicable to a live-in relationship. *State v. Young*, 253 Kan. 28, 37, 852 P.2d 510 (1993). In the defendant's case, the evidence was admissible to show that he was distraught over the breakup and this had a bearing on his intent to kill Jackson.

## ADMISSION OF PHOTOGRAPHS OF INJURIES
## SUSTAINED BY THE VICTIM IN THE EARLIER
## AGGRAVATED BATTERY

The defendant contends that the district court erred in admitting photographs taken by police of the injuries suffered by Jackson in the earlier aggravated battery. He argues that the photographs were more prejudicial than probative.

The admission of photographs in a homicide case is a matter within the trial court's discretion and will not be disturbed absent a showing of abuse of that discretion. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993). Judicial discretion is abused when no reasonable person would take the view of the trial court. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

The defendant does not contend that the photographs were inadmissible but rather that their prejudicial nature outweighed what little relevance they had. However, the photographs were relevant in that they served to corroborate the testimony of witnesses as to earlier injuries suffered by Jackson at the hands of the defendant and the violent discord present in the relationship as well as bearing on the defendant's state of mind and intent. Furthermore, the photographs, although they show the cuts received by Jackson, are not gruesome, nor are they unduly prejudicial.

Under these circumstances, the district court's determination that the photographs were more probative than prejudicial is not a decision with which no reasonable person would agree. The district court did not abuse its discretion in admitting the photographs.

## SUFFICIENCY OF EVIDENCE REGARDING
## ALTERNATIVE MEANS FOR COMMITTING
## AGGRAVATED KIDNAPPING

The defendant's final contention is that the evidence was insufficient to support one of the alternative means by which the offense of aggravated kidnapping was alleged to have been committed. He argues that based upon our decision in *State v. Timley*, 255 Kan. 286, Syl. ¶ 1, 875 P.2d 242 (1994), we must reverse his conviction for aggravated kidnapping.

The defendant was charged with aggravated kidnapping of Jackson in the alternative, based on alternative theories that he took or confined Jackson with the intent to either (1) facilitate flight or the commission of a crime or (2) inflict bodily injury or terrorize her. The jury relied on the first alternative, finding that the aggravated kidnapping occurred to facilitate flight or the commission of a crime. The defendant argues that while the jury could have found that the movement of Jackson to the back hallway may have been done with the intent to facilitate flight in that it placed the defendant near the back door of the Burger King, there was insufficient evidence to support the other alternative means, that the movement was done to facilitate the commission of a crime.

In *State v. Timley*, we addressed a claim that a jury instruction defining the offense of rape was erroneous in that it did not require the jury to unanimously decide whether the sexual acts were committed by force or by fear. We said:

> "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means." 255 Kan. 286, Syl. ¶ 1.

Thus, the defendant's reliance on *Timley* for the rule that substantial evidence must support each alternative means of committing the offense of aggravated kidnapping is correct. However, the defendant's contention that there is insufficient evidence to support a conclusion that the defendant committed the aggravated kidnapping to facilitate his commission of the crime of murder in the first degree is not supported in the record.

The record reveals that the defendant dragged Jackson back around the corner away from anyone who could intervene before administering the final shots. Jackson was still alive and moving at that time and, therefore, the murder was not complete. The testimony of Dr. Eckert established that if the fatal shot had been fired previously, Jackson would have been unconscious almost immediately. The fact that she was still moving at the time leads to the conclusion that the fatal shot came after the defendant had taken her around the corner. It would have been to the defendant's

advantage to take Jackson to the back, away from any possible intervenors, while he attempted to clear his jammed gun. Under these circumstances, there is sufficient evidence for a reasonable jury to conclude that he committed the aggravated kidnapping to facilitate his commission of the crime of murder in the first degree.

Affirmed.