No. 78,644

STATE OF KANSAS, *Appellee*, v. GEORGE R. SPRY, *Appellant*.

(973 P.2d 783)

Opinion filed January 22, 1999.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a direct appeal by defendant George R. Spry from his conviction by a jury of premeditated first-degree murder. A hard 40 sentence was imposed against him. Spry seeks reversal of his conviction and, in the alternative, reversal of his sentence.

We affirm the first-degree murder conviction.

In affirming the conviction of first-degree murder, we consider, but do not find persuasive, Spry's contentions that: (1) the evidence was insufficient to support his conviction; (2) the district court erred by refusing to instruct the jury on the lesser included offense of voluntary manslaughter; (3) the penitential communication privilege under K.S.A. 60-429 was violated; and (4) the district court

erred in allowing testimony of the victim's state of mind on the day of the murder.

The sentencing question is whether there was sufficient evidence to support a finding beyond a reasonable doubt that the murder was committed in an "especially heinous, atrocious or cruel manner." K.S.A. 1993 Supp. 21-4625(6) (now K.S.A. 21-4636[f]). We hold there was not. We reverse the hard 40 sentence and remand for resentencing.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (appeals may be taken directly to the Supreme Court in any case where a life sentence is imposed).

## FACTS

Barbara Chaffee was killed in bed in her home. She died of multiple ax wounds to the back of her head. Spry was Chaffee's ex-boyfriend. Shortly after Chaffee's murder, Spry disappeared. He was arrested almost three years later in San Francisco and returned to Wichita. Because Spry contends the evidence was insufficient to sustain his conviction, we set out the details of Chaffee's relationship with Spry.

In 1992, Barbara Chaffee became acquainted with Janice Reed at church. Chaffee met Spry through Reed. Chaffee and Spry began dating. Spry, Chaffee, and two others lived in an apartment together. Reed described the relationship between Spry and Chaffee as "fine." In the spring of 1993, Spry and Chaffee moved into a mobile home. The mobile home belonged to Chaffee's daughter and son-in-law.

Problems began when Chaffee's daughter needed to move back into the mobile home. Spry became angry because he and Chaffee had improved the home and also paid the next month's lot rent. Reed testified that Chaffee told her Spry became enraged and began tearing out all of the improvements. When Chaffee tried to stop Spry, he threw her up against a wall and held a saw to her throat. Reed testified Chaffee began to have misgivings about her plans to marry Spry.

A few weeks later, Spry and Chaffee made temporary arrangements to live with Reed. Reed and her infant had just moved into

a duplex with her adult daughter, Kristin Hyson, Hyson's infant, and a friend, Tonya Smith. Spry and Chaffee moved into the basement of the duplex. Reed recalled only one argument between Spry and Chaffee while they lived together in the duplex. Apparently, during the argument, Spry ripped out all of the basement phone lines. The next day, Spry told Chaffee that he was leaving. Chaffee agreed. Later that same day, Spry changed his mind, but Chaffee told him to move out anyway. Spry moved out the last week of July 1993.

Chaffee began dating. Spry continued to call both Chaffee and Reed asking to move back into the duplex. Reed testified that she and Chaffee "did not want to make him angry," so she told him to give the relationship time. Spry told Reed that he: (1) was trying to get his anger under control, (2) had sought help, (3) had been diagnosed manic depressive, and (4) was taking medication for depression.

According to Smith, the women were "kind of scared about [Spry] coming around, because he had made—he just made us all uneasy and he wouldn't leave [Chaffee] alone." The women routinely checked to see that the doors were locked and the outside lights were on before they went to bed. Chaffee purchased curtains for Hyson's upstairs room after hearing noises outside the window. The women also moved a life-size cardboard figure of Bill Cosby around the house so that Spry would think there was a man present.

On August 10, the evening of her murder, Chaffee had been at the hospital visiting her daughter. She returned to the duplex sometime after 9 o'clock. Reed's sister-in-law then took Reed and Chaffee to a supermarket to buy bus passes. On their return, Smith told Chaffee that Spry had called. Later, when Chaffee was talking to her ex-husband, Spry called again. When Chaffee talked to Spry he became irritated. Reed testified that Chaffee told her about the phone conversation. Spry said he was trying to get his anger under control. Chaffee said, "I told him if that's how he's showing me he's got his anger under control, he's not doing a very good job of it." Chaffee also said Spry told her "if he couldn't have her, no one could have her." It was now midnight, and Chaffee went to bed.

Reed retired about a half hour later. Hyson and Smith were playing cards at that time. Reed testified that she checked all three upstairs doors to make sure they were locked. She also made certain that the porch and patio lights were on. Reed woke up at 3:30 a.m. to get her infant a bottle. She noticed the child gate at the top of the basement stairs was open. The gate was supposed to be closed and was closed earlier when Reed went to bed. Hyson woke up around 5 a.m. to get her daughter a bottle, and observed the gate was closed. The next thing Reed heard was Chaffee's alarm clock at 6 a.m. Reed checked to see why Chaffee had not turned the alarm off. She found Chaffee face down in her bed; the pillows and blankets, which were pulled up to cover her head, were soaked with blood. Reed roused the other women and dialed 911; however, the phone was dead. She ran to a neighbor's and called the police.

When the police arrived, they found that a screen to the patio door was open, but there were no signs of a forced entry to the door itself. A globe covering the light above the patio door had been removed. The light bulb was partially unscrewed so that the light was off. A yellow tee shirt was found near the globe. Hyson said she had seen Spry wear such a shirt but could not confirm that this was the shirt.

Police found a screen had been removed from the window to Hyson's room in the back of the house. The window was about four feet above a partially constructed deck. The window was open. The contents of the inner window sill had been removed and placed on the deck. The phone lines had been pulled out. Hyson did not sleep in her room that night. She slept with her infant daughter on the living room couch.

An ax with Chaffee's hair and blood on it was underneath the bed. The pathologist who performed the autopsy found that: (1) Chaffee died of chopping wounds to the head, (2) three of the wounds could have been caused by one blow, (3) two other wounds possibly were caused by one blow, (4) only one of the wounds would not have been fatal, (5) each of the remaining seven wounds would all have been fatal, (6) there was no way to determine in what order the wounds were inflicted, (7) there was no evidence

either of defensive wounds or that Chaffee was moving at the time the wounds were inflicted, (8) Chaffee's neck was fractured and her skull was completely ruptured, and (9) Chaffee was alive before the blows were struck.

## DISCUSSION

### The Conviction - Sufficiency of the Evidence

We first analyze whether there was sufficient evidence to support Spry's conviction of first-degree premeditated murder. The standard of review is whether, after reviewing all of the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Kingsley*, 252 Kan. 761, Syl. ¶ 1, 851 P.2d 370 (1993).

The State's theory of the murder was as follows: Spry first put out the patio light by removing the globe from the porch fixture and partially unscrewing the light bulb. He moved to a partially completed deck outside Hyson's room. At some point, he ripped out the phone line. Spry opened the window to Hyson's room and removed the items on the window sill, placing them on the deck. He quietly made his way through the window, down the hall, and past two adult women and their sleeping children. On his way to the basement, he opened the child gate at the top of the stairs. In the basement, he passed yet another person sleeping on a hide-a-bed and entered Chaffee's room. As Chaffee slept, Spry delivered four to eight blows to the back of her head with the ax. He then retraced his steps, closing the child gate on his way out.

The police found: (1) Spry's fingerprints on the porch light globe and light bulb, (2) a yellow tee shirt on the ground near the porch light, which was identified as likely belonging to Spry, (3) Spry's palm print on the window sash of the entry window, (4) a cigarette butt near the entry window containing DNA consistent with Spry's, and (5) Spry's fingerprints on an electrical conduit near the entry window.

During police questioning, Spry admitted missing a stress management class the afternoon of the murder. The police released Spry subject to further questioning. However, later attempts to

locate him failed. Spry's identification card was found on a street in Wichita. He disappeared for almost three years.

Spry emphasizes that his fingerprints were not found on the murder weapon or on the child gate. He also relies on the "rape kit" test performed on Chaffee showing she had intercourse with someone else before her death. (There were no signs of rape.)

Spry explains his fingerprints were found outside of the house because he lived there in the past. He claims there was testimony that he had done "some work" outside the house, which would also explain his fingerprints. He offers no explanation as to why his fingerprints were on the globe, the partially unscrewed light bulb, and the window sash. The globe, bulb, and sash fingerprints were in critical locations. The fact that Spry was not the person who had intercourse with Chaffee before her death is not exculpatory.

The jury could logically conclude that only a person with intimate knowledge of the house could enter the house, kill Chaffee, and exit undetected. The evidence presented by the State supported its theory of how the murder was committed. Viewed in a light most favorable to the prosecution, the evidence shows that a rational factfinder could have found Spry guilty of premeditated first-degree murder beyond a reasonable doubt.

## Voluntary Manslaughter

Spry next claims error in the district court's refusal to instruct the jury on the lesser crime of voluntary manslaughter. Under K.S.A. 21-3107(3), the district court is required to instruct on lesser crimes as the evidence justifies. Such an instruction must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. Follin,* 263 Kan. 28, 33, 947 P.2d 8 (1997). However, the duty to so instruct arises only where there is evidence supporting the lesser crime. *State v. Shannon,* 258 Kan. 425, 427, 905 P.2d 649 (1995).

Voluntary manslaughter is defined by K.S.A. 21-3403(a) as the intentional killing of a human being "upon a sudden quarrel or in the heat of passion." To prove voluntary manslaughter, a killing must be intentional, and there must have been legally sufficient provocation. *State v. Cheeks,* 258 Kan. 581, 590, 908 P.2d 175

(1995). Spry points to his break-up with Barbara Chaffee and his telephone conversation with her the night of her murder.

No reasonable person would have been provoked by Chaffee's statements on the phone that night. Words alone do not constitute a "severe provocation." *State v. McClanahan*, 254 Kan. 104, 114, 865 P.2d 1021 (1993). Further, the provocation must have caused Spry to act without sufficient time for reflection. See *Follin*, 263 Kan. at 35. Spry had ample time for reflection. The district court correctly ruled that there was no evidence supporting voluntary manslaughter as a lesser crime.

### The Penitential Communication Privilege

Spry argues for the first time on appeal that his statements to Reverend Zoerita Fultz should have been excluded under the penitential communication privilege, K.S.A. 60-429(b).

Chaffee had worked as a secretary for Zoerita Fultz, a minister with the Church of God and the associate pastor of the church Chaffee attended. Fultz had counseled Spry and Chaffee individually and jointly several times. On August 9 Spry came by the church looking for Rev. Fultz' husband. Spry said he needed to talk to Mr. Fultz. Rev. Fultz told Spry her husband was not there, but asked if she could help. Spry told her that he was angry because he found out Chaffee was seeing someone else and he felt betrayed. "He said that he was afraid because he was going to be— be hurting somebody that he deeply loved and he didn't want to do that." Spry claims these statements should have been excluded under K.S.A. 60-429(b). Admitting there was no objection to the testimony, Spry argues we should take up the issue under K.S.A. 1993 Supp. 21-4627(2) (authorizing notice of unassigned errors if the interests of justice would be served thereby).

Spry did not assert the privilege during the trial. We have no record of the context of the conversation in terms of whether Spry intended that the conversation be kept secret. Spry was looking for Rev. Fultz' husband, but spoke to the Reverend because her husband was not there. Rev. Fultz told Spry he needed professional help, and there was nothing she could do for him. There is no indication that Spry wanted the conversation to be kept secret. Rev.

Fultz testified that she did not consider the communication privileged. She said on cross-examination, "I'm a little concerned here about confidentiality. It wasn't a—a counseling session in the sense that he was coming to me for counseling. George was—was frightened and he was looking for my husband."

Our obligation under K.S.A. 1993 Supp. 21-4627 in a hard 40 case (to consider all errors asserted in the appeal even though a proper objection was not made below) does not require us to become finders of fact or to make a determination upon which no record exists. *State v. Bornholdt*, 261 Kan. 644, 653, 932 P.2d 964 (1997). The absence of a record to review the context of the communication, coupled with Spry's failure to invoke the privilege, controls. Spry's privilege claim lacks merit.

## Testimony of the Victim's Daughter

Chaffee's daughter testified about her mother's state of mind on the night of the murder. The daughter said, "I think she was afraid of him." Spry contends that this testimony was conjectural, as the witness did not have a sufficient basis for the testimony. Spry's argument is not persuasive.

Chaffee never directly told her daughter that she was afraid of Spry. However, Chaffee did relate stories of prior abuse by Spry. Chaffee told her daughter about the "saw incident" where Spry threw Chaffee up against a wall and held a saw to her throat. Chaffee said the incident "scared her." Chaffee also told her daughter that she was planning to change the telephone number so that Spry could not call and harass her or her roommates. Based on those statements, and the entire context of the conversation between Chaffee and her daughter, there was a sufficient basis for the daughter's testimony. The district court did not abuse its discretion.

## The Hard 40 Sentence

We next examine Spry's challenge to his hard 40 sentence. Spry claims the evidence was insufficient to establish the existence of a K.S.A. 1993 Supp. 21-4625 aggravating circumstance.

The only K.S.A. 1993 Supp. 21-4625 aggravating circumstance at issue here is:

"(6) The defendant committed the crime in an especially heinous, atrocious or cruel manner."

A hard 40 sentence is conditioned on the jury's unanimous finding beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 1993 Supp. 21-4625 exists and that such aggravating circumstances cannot be outweighed by the finding of any mitigating circumstances. K.S.A. 1993 Supp. 21-4624(5).

Our standard of review is whether a rational factfinder reviewing all the evidence, viewed in the light most favorable to the prosecution, could find the existence of the aggravating factor beyond a reasonable doubt. *State v. Alford*, 257 Kan. 830, 837-38, 896 P.2d 1059 (1995).

Spry asserts that the absence of any physical or mental abuse before the killing prevents a finding of the K.S.A. 1993 Supp. 21-4625(6) aggravating circumstance. He relies primarily on *Follin*, 263 Kan. 28, and *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996).

We find Spry's argument on the hard 40 question persuasive. Historically, murder has been the cardinal offense against society. All murders are heinous, atrocious, and cruel. *Cook*, 259 Kan. at 403. However, exceptional circumstances must exist before a murder can be classified as "especially heinous, atrocious or cruel." We have previously said: "The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases." *State v. Willis*, 254 Kan. 119, 129, 864 P.2d 1198 (1993). "A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator *inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate.*" (Emphasis added.) 254 Kan. 119, Syl. ¶ 4.

Does the record here show that Spry in killing Chaffee inflicted serious mental anguish or serious physical abuse on her before her death? We think not.

Our case law has consistently held that, in order to establish the murder as "especially heinous, atrocious, or cruel," *a victim must*

*suffer serious physical abuse or mental anguish before death.* See *Follin,* 263 Kan. at 49-51; *Cook,* 259 Kan. 370, Syl. ¶ 8; *Willis,* 254 Kan. 119, Syl. ¶ 4; and *Kingsley,* 252 Kan. at 791-92.

In *Follin,* we overturned a finding of "especially heinous, atrocious or cruel." Follin killed his two young daughters by stabbing them in the chest. (Each girl had three stab wounds.) We observed that the State argued: " '[Follin] had apparently ripped their blouses open in order to expose their chests so that he could see the exact spot in which he wanted to drive the knife . . . .' " 263 Kan. at 51. Although one girl had contusions on her legs, and Follin took the time to open their clothing before killing them, we held there was insufficient evidence to support a finding that the killings were done in a particularly heinous, atrocious, or cruel manner. Instead, we stated: "Follin's conduct [was] more susceptible to being interpreted as the perpetrator's avoiding infliction of serious anguish or physical abuse before the victim's death." 263 Kan. at 51.

In *Cook,* we again reversed the "especially heinous, atrocious or cruel" finding by the jury. The victim in *Cook* sustained one shot in the chest and one shot in the back. There was also post-death mutilation of the victim's body. The coroner in *Cook* testified that death occurred as a result of hemorrhaging from the bullet wound to the chest. 259 Kan. at 396. We held there was insufficient evidence to support a finding that the killing was done in a particularly heinous, atrocious or cruel manner, saying:

"The legislature, by using the phrase 'in a particularly heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases. . . . Most of the State's arguments regarding 'torture' experienced by the victim in this case are based on conjecture or speculation." 259 Kan. at 403.

In *Kingsley,* we upheld a finding of "especially heinous, atrocious, or cruel" as well as two other aggravating factors under K.S.A. 1992 Supp. 21-4625. The facts in *Kingsley* bearing on the victim's anguish before death are markedly different than the before death facts here. Kingsley testified that he hit the victim "on the head with a wine cooler until she was unconscious." 252 Kan. at 764. The victim was then stabbed five times in the chest, and

dragged to the bedroom where her throat was slit. Kingsley testified that his girlfriend, Sherri, stabbed the victim and slit the victim's throat. The forensic evidence showed that the victim's injuries on her "hands, face, and head, were consistent with her putting up a fight and being hit on the head." 252 Kan. at 764. Sherri denied being present during the victim's death. She "testified that Kingsley had described the victim putting up a terrific struggle:

" '[H]e went after [the victim], started to strangle her. She was fighting with him. And he kept on trying to strangle her. He told me one time he couldn't believe that she wouldn't die and that he finally got her to like pass out and he had used two or three different type knives of hers to slice her throat and stab her.' " 252 Kan. at 793.

Our holding in *Kingsley* is consistent with our holding here.

## The State's Argument

The State asserts that Spry had physically and mentally abused Chaffee in the weeks leading up to the murder. Beyond this assertion, the State has little else to support its position. We find no evidence in the record that Spry ever threatened Chaffee's life or that she felt that she was in mortal danger from Spry. Further, Reed testified she did not know of any violent episodes resulting in actual physical harm to Chaffee.

At sentencing, the State argued as follows:

"Your Honor, the aggravating circumstance they did find was that the defendant committed this crime in an especially heinous, atrocious or cruel manner. And, Your Honor, that's exactly what happened in this case. As you will recall, what Dr. May [the pathologist] testified to was that there were at least — there were several blows, possibly up to eight blows. All but the one glancing blow which went under the skin and did not break the skull could have been lethal blows. She could not tell what order they came in. There was no way to tell that. *But, clearly, this is overkill.* That's exactly what it is. This is not just a murderer, someone who is trying to make sure this person is dead, this is someone who is pulverizing the victim. *It's overkill.* And it's also, Your Honor, not just a crime of rage, which often you see in a crime of overkill, this was a clearly planned out, thought out scheme by this defendant." (Emphasis added.)

The State's argument is, essentially, that the killing was especially heinous, atrocious, or cruel because of the type and number of wounds sustained by the victim. The State's "overkill" description

under the facts here, as developed through the pathologist's testimony, does not support a finding that the killing was done in an especially heinous, atrocious, or cruel manner. The victim's physical and mental condition before death is critical. *There is no argument or even discussion here that Chaffee suffered physical or mental anguish before death.* K.S.A. 1993 Supp. 21-4625 (listing aggravating factors) does not reference the instrument of death. No legislative classification includes or excludes a murder as "especially heinous, atrocious or cruel" based on the killer's choice of weapon. We acknowledge that society's image of an ax murder rises above most other forms of murder on a scale of depraved behavior. However, the aggravating circumstance at issue here is established when the defendant inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes the victim's uncertainty as to his or her ultimate fate. *State v. Perry*, 266 Kan. 224, 234, 968 P.2d 674 (1998).

If we assume that the first blow was the one nonlethal blow, Chaffee was killed with the second blow. Even with this assumption, there is still no indication that she suffered serious physical or mental anguish from the method of killing before she died. Both the State and Spry agree the reasonable conclusion is that Chaffee was sleeping. No evidence tends to show that there was a significant time lapse between blows, suggesting suffering. It is just the opposite. The pathologist testified there were no defensive wounds and no sign Chaffee moved at all during the attack. Therefore, all "overkill" blows after the fatal blow are irrelevant in a hard 40 analysis. Mutilation of a body after death does not support a finding that a killing was done in an especially heinous, atrocious, or cruel manner. See *Kingsley*, 252 Kan. at 794. Further, our case law has never mentioned premeditation or planning as a proper consideration in a hard 40 analysis.

Chaffee was struck from the back as she was lying face down in her bed. Chaffee's neck was broken by the impact of the blows. There was no evidence that she either was subjected to repeated blows while living or knew the nature of Spry's weapon. The pathologist could not conclude whether Chaffee was conscious or unconscious at the time of the attack. There is no evidence showing

that Chaffee had any awareness of the physical assault which resulted in her death.

In *Cook*, a twitching victim bled to death from two gunshot wounds. In *Follin*, the girls were partially disrobed and killed one at a time. In both *Cook* and *Follin*, the victims were cognizant of the fact that they were being attacked, and the attacks most likely came from the front. In both cases, we ruled there was insufficient evidence to support a finding that the killings were committed in an especially heinous, atrocious, or cruel manner. Considering the standards set forth in *Follin* and *Cook*, there was insufficient evidence here to support a finding beyond a reasonable doubt that Chaffee was killed in an especially heinous, atrocious, or cruel manner.

More than 5 years ago in *Willis* we adopted the following language as constitutionally acceptable as the sentencing instruction under K.S.A. 21-4625(6):

"The State of Kansas contends that the following aggravating circumstances are shown from the evidence:

"The defendant committed the crime in an especially heinous, atrocious, or cruel manner. The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

"A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts *serious mental anguish or serious physical abuse before the victim's death*. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate." (Emphasis added.) 254 Kan. at 130.

The legislature has not indicated a disagreement with our reading of its intent in adopting K.S.A. 1993 Supp. 21-4625(6). The legislature is free, of course, to amend the statute.

Because we conclude that there was insufficient evidence to support the jury's finding that the murder was committed in an especially heinous, atrocious, or cruel manner, we need not reach Spry's claims that: (1) a mitigating factor outweighed the aggravating factor, and (2) the district court abused its discretion by supplying dictionary definitions of the terms "wicked" and "vile" to the jury when the jury requested a clarification of those terms.

Spry's conviction of first-degree murder is affirmed. Because the jury did not find any aggravating circumstance other than K.S.A. 1993 Supp. 21-4625(6), Spry's hard 40 sentence is set aside and the case is remanded to the district court for resentencing.

McFARLAND, C.J., dissenting: The majority opinion holds the evidence was insufficient to support the jury's finding that the murder was committed in an "especially heinous, atrocious or cruel manner." K.S.A. 1993 Supp. 21-4625(6). The standard for appellate review of this finding is whether a rational factfinder reviewing all the evidence, viewed in the light most favorable to the prosecution could find the existence of this fact beyond a reasonable doubt. *State v. Alford*, 257 Kan. 830, 837-38, 896 P.2d 1059 (1995).

The evidence established a history of defendant's escalating violence toward Ms. Chaffee prior to his moving out of the residence on July 30. In the days that elapsed before her August 11 death, Ms. Chaffee was obviously in terror of defendant. She believed she was being stalked by the defendant. When she visited her daughter at a local hospital at night, she had the security guard accompany her to her automobile. The three other women living in the residence were also frightened for her. During this period, because of noises and door rattling, the four women believed defendant was repeatedly returning to the house and attempting to gain entry. Police were called to check the house at least twice. Defendant called daily, sometimes five or six times a day. A friend of the group gave them a life-size cardboard cutout of Bill Cosby which they moved around the house in hopes that defendant would think a man was living there and would leave Ms. Chaffee alone. Because of their fear of defendant, each of the women checked the locks on the doors and windows before going to bed; they left the outside lights on for further protection. All three of the other women knew that Ms. Chaffee was in danger, and they were afraid of what would happen if defendant became angry.

On August 8, Ms. Chaffee was at church, and her minister noticed that she was nervous and fidgety. The Reverend asked if she was okay. Ms. Chaffee told her she was frightened and that she had to hurry up and get home.

On August 9, defendant told this same minister that he was going to be hurting someone he loved. On August 10, defendant told Ms. Chaffee that if he could not have her, no one could have her. That evening, all four women went to bed after their nightly ritual of checking the locks on the doors and windows. The last two women to retire heard noises before they went to bed but could not identify them.

Sometime during the early morning hours of August 11, defendant unscrewed the outside patio light and jimmied a bedroom window on the first floor. Defendant knew that that bedroom's occupant had been sleeping in the living room because her waterbed was being repaired.

Defendant entered the house, where four women and two infants were sleeping, carrying an ax that was 36 inches from top to bottom. Each sharpened edge was 4½ inches long. He disabled the telephone by pulling the line out. Defendant carried his ax by two sleeping women and two infants. He descended the basement stairs and walked by another sleeping woman to Ms. Chaffee's room. Defendant hit Ms. Chaffee in the head as many as eight times with the ax.

Ms. Chaffee was found face down in her bed with her bedroom slippers on. A light was on downstairs that had not been on the night before.

Defendant entered the house with the plan and intent to kill Ms. Chaffee with an ax. His disablement of the telephone lines shows he was not relying on stealth for the killing or escape. Only two people know exactly what went on in that basement room—defendant and victim. The victim cannot testify—multiple blows to her head with an ax made sure of her unavailability. She was found in bed wearing her slippers. Did he tell her what he was going to do and then make her lie face down on the bed? Was she paralyzed by the first blow, but conscious? The victim cannot tell us.

In our society, the very thought of being the object of an ax murderer's rage is the ultimate horror, the stuff of which nightmares are made and on which Hollywood and television feed. This was the manner defendant chose for his victim's death.

The jury heard all of the evidence, considered whether this murder was committed in an especially heinous, atrocious, or cruel manner, and concluded that it was. The record viewed in the light most favorable to the prosecution is legally sufficient to support this finding. I would affirm defendant's hard 40 sentence.

LOCKETT J., dissenting: I join in C.J. McFarland's dissent and respectfully dissent from the majority's reasoning for reversing Spry's hard 40 sentence. The majority misconstrues the statute and the existing case law in concluding that the premeditated ax murder of the victim was not committed in an especially heinous, atrocious, or cruel manner.

The murder of Chaffee occurred in August of 1993. The standard for reviewing hard 40 sentences for crimes committed prior to 1994 is whether a rational factfinder reviewing all the evidence, viewed in the light most favorable to the prosecution, could find the existence of the aggravating factor beyond a reasonable doubt. *State v. Alford*, 257 Kan. 830, 837-38, 896 P.2d 1059 (1995).

One of the considerations for determining whether to sentence to a hard 40 term a defendant who has been convicted of premeditated murder is whether the murder was committed in an especially heinous, atrocious, or cruel manner. K.S.A. 1993 Supp. 21-4625(6). In *State v. Willis*, 254 Kan. 119, Syl. ¶ 4, 865 P.2d 1198 (1993), we defined the following terms: "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others. A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. *State v. Duke*, 256 Kan. 703, 716, 887 P.2d 110 (1994).

Where the evidence shows that the defendant inflicted serious mental anguish or serious physical abuse on the victim, we will uphold a finding that the manner of death was especially heinous, atrocious, or cruel. Post-death mutilation on the corpse of the victim does not support a finding that the manner of death was especially heinous, atrocious, or cruel.

The general rule in Kansas is that a premeditated shooting murder is not a crime committed in an especially heinous, atrocious, or cruel manner. To impose the hard 40 sentence for a premeditated shooting murder, there must also be evidence that the victim suffered an awareness of his or her impending death prior to the shooting or some form of torture prior to death. If no such evidence exists, a hard 40 sentence based on the shooting and a finding that the manner in which the crime was committed was especially heinous, atrocious, and cruel must be set aside. See *State v. Cook*, 259 Kan. 370, 401-03, 913 P.2d 97 (1996).

We have also refused to sustain a finding that the crime was committed in an especially heinous, atrocious, or cruel manner where the defendant exercised care to minimize the physical trauma in causing the victim's death. See *State v. Follin*, 263 Kan. 28, 51, 947 P.2d 8 (1997). In *Follin*, the defendant received a hard 40 sentence for killing his two children. The defendant was a mentally distraught father who inserted a knife three times into the heart of each child. On appeal, the *Follin* court set aside the hard 40 sentence, finding that the killings could have been done in such a way as to minimize the anguish and physical abuse on the children. 263 Kan. at 51.

In post-death mutilation cases we have rejected the finding that the crime was especially heinous, atrocious, or cruel. Murder is complete with the death of the victim. Subsequent mutilation of the victim's body does not constitute the manner in which the murder was committed. *Cook*, 259 Kan. at 400. Therefore, post-death mutilation is not evidence that the premeditated murder was committed in an especially heinous, atrocious, or cruel manner.

Where the manner of death was especially heinous, atrocious, or cruel, and the victim was unaware of his or her impending death, we have affirmed the hard 40 sentence. In *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993), there was no evidence that the victim was conscious when the defendant dragged her from room to room, stabbed her, cut her throat, placed matches in her pubic hair, and set the house afire. The jury was instructed that the phrase "heinous, atrocious or cruel is directed to those crimes where the death of the victim was preceded by torture of the victim

or serious physical abuse." 252 Kan. at 791-92. The hard 40 sentence was imposed. The defendant appealed, claiming that because the victim had not been aware of the manner of her death, imposition of the hard 40 sentence was error.

The *Kingsley* court held that serious physical abuse which occurs after the victim is rendered unconscious but before the victim's death is relevant in determining if the victim was murdered in an especially heinous, atrocious, or cruel manner. "What is relevant to that determination is the manner in which the victim was murdered." 252 Kan. at 794. Therefore, a finding that the victim was aware of his or her fate or felt the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious, or cruel.

Although Chaffee was unaware of the multiple ax blows to the back of her head, she was alive prior to Spry delivering the ax blows. Unlike the physical abuse in the post-death mutilation cases where death occurs and the defendant then commits furthers acts of violence on the corpse of the victim, the act of delivering multiple ax blows to Chaffee's head was one continuous act of physical violence inflicted by Spry to cause Chaffee's death. Spry had no intention of mutilating Chaffee's corpse with subsequent blows to her dead body; his sole intent in delivering each of the blows was to cause the death of Chaffee.

After reviewing all the evidence, viewed in a light most favorable to the prosecution, I am convinced that a rational factfinder could have found beyond a reasonable doubt that the ax murder of the victim was especially heinous, atrocious, and cruel. Under these facts, I would affirm the district court's imposition of the hard 40 sentence.